STATE OF IOWA, appellee, v. OLIVER GREEN, JR., appellant.

No. 50821.

(Reported in 121 N.W.2d 89)

Apᴘʀɪʟ 9, 1963.

James Lawyer, of Des Moines, for appellant.

Evan A. Hultman, Attorney General, John Allen, Assistant Attorney General, Sam Erhardt, County Attorney of Wapello County, and John Moreland, Assistant County Attorney, for appellee.

Pᴇᴛᴇʀsᴏɴ, J.—County Attorney's information was filed on March 24, 1961, against Oliver Green, Jr., charging him with arson. The fire occurred on the evening of October 1, 1960. The evidence was all circumstantial.

In substance as to the highlights, the facts offered in evi-

dence were as follows: One witness testified that at approximately six o'clock p.m. on October 1, 1960, the appellant was observed entering the Marshall Auto Store in Ottumwa with two G.I. type gasoline cans. Defendant, a truck driver, admitted he was in Ottumwa, but denied he entered the Marshall store.

A few minutes before eight o'clock on the evening of October 1 a pedestrian walking past the Marshall Auto Store detected a strong odor of gasoline.

At approximately eight o'clock p.m. a loud explosion occurred at the Marshall Auto Store scattering debris over the adjacent streets. The building burst into red flames. Heavy black smoke came from the store. In spite of the almost immediate arrival of the firemen, and the application of great quantities of water, the building was consumed within one hour.

Three experts on the subject of fires testified in answer to hypothetical questions setting forth the circumstances of the Marshall Auto fire. They stated in their opinion the fire was of incendiary origin. The natural gas connection to the Marshall Auto building was closed at the time of the fire and tanks containing fuel oil in the basement of the building were intact after the fire.

A Deputy State Fire Marshal started looking for defendant on October 7, 1960, but did not find him until January 17, 1961. The Marshal found he had left his home in Kansas City a short time after the occurrence of the fire.

The State Fire Marshal, William Johnson, accompanied by M. D. Huffman, agent for the National Board of Fire Underwriters, found defendant living at El Monte, California. They interrogated him for four hours. He stated verbally he was willing to take a lie-detector test. They made an appointment with him to see him at his home at nine o'clock the following morning. When they arrived the next morning they found he had moved out with his wife and five children during the night, without leaving any forwarding address. They reported his disappearance to the F.B.I. and he was later found at Kansas City, Missouri.

In response to the County Attorney's information he was

brought to Iowa, filed bail bond for appearance and was tried at Ottumwa in Wapello County in December 1961.

Appellant urges six assignments of error. 1. The circumstances shown by the evidence offered were not sufficient to establish guilt and the case should not have been submitted to the jury. 2. The hypothetical questions submitted to three witnesses did not give sufficient details as to the facts, to justify submitting them for an opinion as to the incendiary nature of the fire. 3. Instruction No. 13 with reference to flight was wrongfully submitted to the jury. 4. The trial court should have considered affirmatively the offer of newly discovered evidence submitted by defendant. 5. The County Attorney was guilty of misconduct in his opening statement to the jury in which he emphasized what he was going to prove with reference to defendant taking a lie-detector test. 6. Keeping the jury in the jury room through the night and for almost 27 hours without sleep or rest caused such a condition of mental and physical fatigue as to several jurors that defendant did not get the fair trial to which he was entitled.

We will consider later very briefly the four first assignments of error. They are without merit.

Defendant filed motion for arrest of judgment, and this we are rejecting.

On the basis of assignments 5 and 6 we are sustaining the motion for new trial and remanding the case.

 I. In his opening statement to the jury as to the proof he was going to offer, the County Attorney stated that defendant had agreed to take a lie-detector test in his conversation with the witnesses Huffman and Johnson in California on January 17, 1961. He never took the test, which was his privilege. When the County Attorney made this statement to the jury at the beginning of the trial he knew the test had not been taken. He was an able and experienced lawyer and knew that the decisions of this court, as well as the decisions of the courts in almost all other states of the nation, held that reference could not be made to the taking or not taking of a lie-detector test, and that such reference was misconduct. There was an attempt later in the trial of the case to inject the matter into the evidence but

the trial court very carefully and meticulously sustained objections to the evidence being given to the jury.

The agreement to take a lie-detector test in State v. McNamara, 252 Iowa 19, 28, 104 N.W.2d 568, was in writing, and the court held on such basis, evidence about it was admissible. However, the court said in the McNamara case: "The weight of authority in the courts of last resort is against receiving evidence of such tests in criminal cases either for or against the defendant."

This is a very sensitive and touchy subject. It may appear somewhat insignificant upon casual consideration, but careful thought establishes the fact that the matter of taking a lie-detector test is so important to a party in a criminal case that it has the possibility of making or breaking his case.

It is true the trial court in the case at bar cautioned the jury that they were to pay no attention to what had been said, nor to the evidence which had been elicited as to the lie-detector test. However, the difficulty with this situation is that even in the face of such caution by the court the poison still remains. It is akin to the placing of a nail in a board. The nail can be pulled out, but the hole made by the nail cannot be removed.

This question received careful attention in the Minnesota case of State v. Kolander, 236 Minn. 209, 220, 222, 52 N.W.2d 458, 464, 465. We adopt the reasoning in this opinion. The court said: "A great deal has been written on the development and reliability of the so-called lie detectors, but up to the present time the almost unanimous holding of all courts which have passed upon the question is that the results of such tests are inadmissible. * * * The state concedes that the results of a lie-detector test would not be admissible, but contends that it may nevertheless be shown that defendant refused to take such test, since such refusal is evidence of a consciousness of guilt similar to evidence of flight. With this we cannot agree. * * * The impact upon the minds of the jurors of a refusal to submit to something which they might well assume would effectively determine guilt or innocence, under these conditions, might well be more devastating than a disclosure of the results of such test, if given after a proper foundation had been laid showing how the

apparatus functioned. Where a conviction rests so completely on circumstantial evidence, the erroneous admission of such action on the part of defendant might well be enough to tip the scales against him. We believe that it was prejudicial error to permit such refusal of defendant to submit to the test to be shown."

In the case at bar the existence of the poison in the jury room appears in the affidavit of Juror Garnett Shank when she states in her affidavit in support of defendant's motion for new trial as follows: "Nina McNamer repeatedly asked the question: 'If Oliver Green is so innocent, why didn't he take that lie-detector test?'" Miss McNamer denied this in a counteraffidavit, but the fact remains that three other jurors referred to the substance of this statement. One juror could have been mistaken, but this would hardly apply to four jurors.

The trial court attempted to excuse the statement and action of the County Attorney by saying he acted in good faith. This is not the measuring stick to be used. The criterion is whether or not defendant was improperly and unduly prejudiced.

We said recently in State v. Tolson, 248 Iowa 733, 734, 82 N.W.2d 105: "A prosecuting attorney should use his best efforts to represent the State, vigorously and forcefully, in presenting its case within the bounds of proper legal procedure. He owes a second duty, of no less importance, to see that the accused has a fair trial. He is an officer of the court and must observe the requirements of due process of law. We have commented upon this duty many times and have been compelled to reverse many cases because it was disregarded." (Three citations)

As a general statement see 89 C. J. S., Trial, section 462, page 96: "The verdict will be vitiated, however, if the jury discuss and consider as a basis for their findings of fact something which is not legally admitted evidence, or if they have let their verdict be influenced by the discussion and consideration of improper matters not in issue and which cannot legally have any effect on the rights of the parties."

Because of these remarks by the County Attorney at the time of the commencement of the trial, and his attempt to inject

the matter into the trial, defendant was prejudiced and did not receive a fair trial. Defendant's counsel moved for a mistrial immediately after these statements were made by the County Attorney, which motion was overruled by the trial court.

■ II. We start with the premise that ordinarily all deliberations in the jury room inhere in the verdict. If this were not true it would be difficult to ever finally conclude a case. However, there are rare exceptions to this rule: 1. If it definitely and affirmatively appears the jury has been discussing and have based their decision on evidence excluded by the court. 2. If the complaint of the party pertains to matters completely foreign to the issues, like the inability of the jury, or a substantial number of the jurors, to properly deliberate because of physical and sometimes mental conditions interfering in deliberation.

■ ■ In the case at bar the jury proceeded to the jury room at 11:20 a.m. on December 14, 1961. They deliberated all of the remainder of that day and all through the night, without sleep, and until 9:40 a.m. on December 15 when they were called back to the jury room by the trial court. He first inquired as to how they stood on the case. He was very careful to explain to the jury that they must not give him the manner of voting, but simply the number, to see how they stood. The foreman told him that during all of the preceding 22 hours they had voted on a basis of 9 to 3. It had stood at that number through several ballots, and was the same on a ballot recently taken.

The jury did not ask and the court did not give the jury any further or amended instructions. The court in substance told them that the case would have to be decided by either this jury or some jury sometime; that the court felt that they should be able to discuss the issues of the case further and arrive at a verdict. They returned to the jury room and remained in session for an additional four hours and 45 minutes. In other words, the jury had deliberated for a total of almost 27 hours.

The trial court did not arrange for the jury to get a nights lodging on the evening of December 14.

Rule 202, Rules of Civil Procedure, provides: "The court may order the sheriff to provide suitable food and lodging at

the expense of the county for a jury being kept together to try or deliberate on a cause."

In its order overruling the motion for new trial the court gave two reasons for not providing for lodging for the jury. The first was that it had "never been the practice in said judicial district to separate the jury after final submission, and lodging has not been furnished jurors after commencement of their deliberations." The custom in any district does not control the matter of what procedure would be the best as to the deliberations of a jury. The trial court must have been aware of the fact that there were four elderly ladies upon this jury, ages 56, 58 and 60, and an all-night vigil for such persons would not be inducive to continuous sensible discussion of the issues. The second reason given by the trial court was the length of time consumed by a jury in deliberation inhered in the verdict. The court cited State v. Siegel, 221 Iowa 429, 264 N.W. 613, and State v. Banks, 227 Iowa 1208, 290 N.W. 534, in support of its position on this point.

In State v. Siegel the jury deliberated for a total period of 90 hours. During said period they lived a normal life of lodging at night and eating at regular times. In State v. Banks, the jury apparently were hurried to their conclusion by seeing a newspaper article which stated the jury would be held over Memorial Day. Two of the jurors said this caused them to decide the case before Memorial Day.

In both cases there was a suggestion that the length of time during which a jury deliberated inhered in the verdict. However, conditions in the two cases differ from the conditions as we find them in the case at bar. There was no evidence of complete exhaustion and failure to be able to properly deliberate in said cases, as we find in the case at bar. The criterion is not the number of hours which a jury uses in deliberation, but the conditions under which such deliberation takes place.

After the jury returned from hearing the wholesome statements made by the trial court, and continued its deliberation, various jurors gradually one by one changed their ballot from acquittal to conviction. Even this took over four hours.

Defendant filed the affidavits of five members of the jury in

support of his motion for new trial. The State filed the affidavits of seven members of the jury in support of its resistance to the motion. In some respects various affidavits were in contradiction of each other, but as to most matters there was little conflict. There was a suggestion in substance that the affidavits balanced each other off about evenly. This was not correct as to the vital point: lack of sleep and rest on the part of the jury, and complete exhaustion, with inability to properly consider the merits of the case.

Juror Garnett Shank, 56 years of age, stated as to conditions after returning from the interview with the court: "At this point I got scared, panicked, and even trembled. At this point I was so tired that I wasn't sure what the instructions said. * * * couldn't comprehend the instructions when I would read them, due to my worn-out condition after so many hours of deliberation. I had gotten up at approximately 6 a.m. on December 14 and hadn't had any sleep for approximately 32 hours when the verdict was finally reached, * * *. I found it almost impossible to stay awake during the last few hours of our deliberation, and found when I would read the instructions during those last few hours of our deliberation that I just could not grasp the instructions. The jury was so tired by noon on December 15, 1961, that after approximately 25 hours of deliberation no one of us wanted to go out to eat lunch. We were so tired that we had sandwiches, coffee, milkshakes, etc., sent up to the jury room. * * * my mind seemed to be a blank, and I just didn't feel capable of making any decision on anything in my exhausted condition. I just fell apart and was actually trembling during the last hour or so of the jury deliberation. I was one of the last two to vote for conviction. * * * I felt like I had been 'brainwashed' and beaten down in my weakened condition, and finally got so tired I didn't feel like I could trust my own judgment. * * * I was exhausted both physically and mentally so that pressure from other members of the jury unduly influenced me. * * * I have worried and brooded about the result of this trial ever since because I do not feel that justice was done. I don't think that Oliver Green, Jr., had a fair trial. I don't think the jury was fit to judge anybody in their frame of

mind and worn-out condition after we re-entered the jury room after 24 hours of deliberation."

Juror Olive Johnson, 58 years old, stated in her affidavit: "After 24 hours of deliberation I was mentally exhausted. I don't think it is right and I don't think it is right to a defendant to require a jury to deliberate without rest as long as we were required to deliberate in this case. A person's mind isn't alert after so many hours of deliberation without rest and sleep. * * * I had never taken any No Doze pills before the trial, but during the course of the trial I took a whole box of No Doze pills or tablets in order to try and keep from going to sleep. I understood that I was only to take one No Doze tablet at a time, but it got so that one tablet wouldn't do me any good, so I would take two, and one time I even took three at a time in order to keep from going to sleep. * * * I have poor circulation in my legs and when I don't get proper sleep, my legs and ankles swell until they are at least twice their normal size, and when this occurs, they are very painful. During these jury deliberations my ankles and legs swelled twice their normal size and hurt me something awful. * * * In addition to the No Doze tablets I also took two 25c boxes of Anacin tablets for relief of pain."

Faith Morrow, 58 years old, stated: "We were required to deliberate during the entire 27 hours without being given an opportunity to go to bed or get any sleep. * * * I voted for the acquittal of the defendant in every ballot that was taken except the very last ballot, and I did not think he was guilty when I voted for conviction on the last ballot, but gave in and voted for conviction because I was completely worn out. * * * I know that I would never have given in and voted for conviction of the defendant if I had had an opportunity to have a reasonable amount of rest and sleep."

Juror Orlena Brownell, 58 years old, stated: "I had voted not guilty for the entire first 24 hours of our deliberations. After this period of time, I was befuddled, and wondered if I was reading the instructions right when I would try to read the instructions of the Judge. After 24 hours of deliberation, I was mentally exhausted."

Juror Clella Hardesty, 60 years of age, said: "I had gotten up at approximately 6 a.m. on December 14, 1961, the day the jury began their deliberation, and hadn't had any sleep for approximately 32 hours when the jury verdict was finally reached. I voted not guilty for the entire first 24 hours of our deliberation. I was very tired after 24 hours of deliberation. * * * It doesn't seem right to me to expect a jury to deliberate without sleep or rest as long as we were required to deliberate on something as important as the guilt or innocence of a person charged with arson. * * * I never have felt and still don't feel that Oliver Green, Jr., set the fire at the Marshall Auto Store."

If this had been the testimony of one juror it could be possible that he or she was mistaken as to the implication involved in loss of sleep. However, five jurors (almost one half of the jury panel) stated in their affidavits that they were exhausted and that it was impossible for them to properly deliberate, and some of them at least toward the end of the jury deliberation changed their ballot from acquittal to conviction by reason of complete exhaustion.

It is our conviction that because of the circumstances and conditions above outlined, the rights of defendant were seriously prejudiced and he failed to secure the fair trial to which every defendant is entitled under our system of jurisprudence. We, therefore, reverse the case and send it back for a new trial.

III. The new trial is granted only on the two assignments of error outlined above. Having made the decision we will devote only brief space to the four other assignments of error made by defendant. 1. As to the first assignment which contends that the circumstantial evidence was not sufficient to submit the case to the jury, we are not in accord and hold the evidence was sufficient. 2. Instruction 13, which is the flight instruction, is in proper form according to the evidence as produced by the State. No error was committed by the trial court in the giving of this instruction. 3. The trial court was correct in admitting the evidence of the duly proven competent witnesses as to the hypothetical question submitted to such witnesses bearing upon the question of the fire being of incendiary origin. 4. Defendant's contention as to newly discovered evi-

dence does not need our attention. Any evidence, material or pertinent, can be offered at the new trial.

The case is reversed and remanded for a new trial.—Reversed and remanded.

All JUSTICES concur as to Division II and as to the reversal.

SNELL, MOORE and THOMPSON, JJ., and GARFIELD, C. J., dissent as to Division I.

SNELL, J. (dissenting in part)—I agree that this case should be reversed and remanded for the reasons discussed in Division II of the opinion.

I dissent from the conclusions reached in Division I.

I do not agree that reference to an agreement to take a lie-detector test followed by sudden departure before the appointed time was reversible error. We are not determining the admissibility of results of a test or of a refusal to take a test. Here there was an agreement by defendant to take a test at a specified time at his home. The time was nine o'clock the next morning. When the time arrived it was discovered that defendant with his wife and five children had departed for parts unknown. I see no error in reference to an agreement breached by flight.

GARFIELD, C. J., and THOMPSON and MOORE, JJ., join in this dissent.