403 P.2d 816

STATE of Arizona, Appellee,

v.

John Boswell SNEED, Jr., Appellant.

No. 1451.

Supreme Court of Arizona.

In Division.

June 30, 1965.

Darrell F. Smith, Atty. Gen., Robert W. Pickrell, Former Atty. Gen., Phoenix, Norman E. Green, County Atty. of Pima County, Carl Waag, Deputy County Atty., Tucson, for appellee.

Johnson, Walton & Mills, by Bernard I. Rabinovitz, Tucson, for appellant.

LOCKWOOD, Chief Justice.

Appellant, who shall hereafter be called defendant, was charged with having robbed the Public Finance Company at 31 East Broadway, Tucson, Arizona, on November 12, 1962. He was tried on said charge three times. The first two trials resulted in hung juries. The third resulted in a conviction.

Subsequent to the conviction and sentencing of defendant a letter dated September 23, 1963, was received by the Pima County Attorney's office, from one Persons, an inmate in the Arizona State Prison. In this letter Persons asked to have a representative of the County Attorney's office talk with him, and stated he had been "mixed up" in a robbery in Tucson. Persons later testified to facts indicating he had committed the robbery for which defendant was convicted.

Pursuant to Rule 310(3) of the Rules of Criminal Procedure, 17 A.R.S. the defendant moved for a new trial based on newly discovered evidence. This appeal is from the denial of that motion after a hearing. The defendant contends that this denial, in the face of the testimony of Persons to the effect that he, and not the defendant committed the crime charged, amounted to an abuse of discretion.

During the course of the third trial below which resulted in a conviction, the evidence identifying the defendant as the person who committed the alleged robbery was weak. The prosecution witness, Barbara Ann Clark, cashier at the Public Finance Corporation was the alleged victim of the robbery. She testified that at approximately 10:00 A.M. in the morning of November 12, 1962, a man walked into the office and walked out again. The only description she could give was that he was wearing a cowboy style hat. At about 10:30 A.M. "a gentleman walked back into the office." He put his right hand with a brown paper bag over it and handed the witness another brown paper bag and demanded money, which the witness gave him. When asked what the man looked like she answered:

"He had on a white straw cowboy hat, he had on military type sunglasses, green khaki pants, white short-sleeved shirt, plaided. I knew it was plaid, it was either green or gray. As he walked out the door I noticed he had a key chain in his back pocket."

She also testified that a man was brought into the office by a police officer shortly after the robbery. When asked to identify him, she told the police officer "I just couldn't identify him." At the trial she described the man who was brought to the office by the police, as follows:

"He had on the green khaki pants. He had the white short-sleeved shirt,

I didn't pay any attention—he wasn't very neatly shaved as he wasn't at the time of the robbery. The glasses and the hat were missing. He acted as if it was a sort of joke.

"Q. A solid white shirt?

"A. No, white background; the background of the shirt was white.

"Q. What color was it?

"A. Plaid or striped."

Later the witness was taken to the police station where she was shown a lineup which included the defendant and two other men. She made an identification of the defendant without the glasses and the hat and then with the glasses and the hat. At the trial she identified the defendant as the man who had robbed her.

The prosecution showed the witness a hat and a shirt which she identified as "similar" to those the robber was wearing. She also said the shirt was "the shirt that he had on at the time I identified him." She was then shown a pair of sunglasses and two paper bags marked "Five Jumbo Deluxe Hamburgers, $1.00". She was asked if these objects appeared to be the same or similar to those "worn or used" by Mr. Sneed "on" the day in question. She replied that they were similar or appeared to be the same.

She was also shown a key chain and asked if it was the same key chain she testified to on direct examination. She answered:

"Yes, sir, it is the same, but the red part wasn't visible to me at the time he walked out of the door, but it was when I identified him in a police station.

*   *   *   *   *   *

"Q. Where have you seen that key chain or a key chain similar to that before?

"A. On Mr. Sneed.

"Q. When was that?

"A. When I identified him at the police station.

"Q. And did you see that key chain or a similar one in the store, the Public Finance Company?

"A. Similar to this at the time of the robbery."

The defendant was then required to stand, and face the witness, put on the hat and the sunglasses. As was stated by the prosecutor:

"Q. Please put on your hat. Please put on your glasses on with the tag behind your ears."

Then the witness identified the defendant as the man who robbed her.

Ronald Byerly, a member of the City Police Department, on November 12, 1962, received a call about the alleged robbery at

10:57 in the morning. The description he was given of the alleged robber was:

"White male, approximately 5 foot 10, 150 to 175 pounds, wearing dark green trousers and a light green or light green shirt with pin stripes in it of a plaid type."

\* \* \* \* \* \*

"\* \* \* it was given on the air as wearing a straw hat something like a cowboy hat and sunglasses."

When the officer first saw the defendant he was wearing a "striped shirt, and had a pair of dark green pants" but was not wearing a hat or sunglasses. Contrary to Miss Clark, he testified that when he brought the defendant to the Public Finance Office for identification Miss Clark positively identified the defendant.

The court allowed the exhibits into evidence:

"for a limited purpose, not as being definitely identified as the items worn by the defendant, that is the glasses and the hat, but being similar to the ones that were worn by him and the bags as being similar and having the same writing on them and so forth as the ones presented to the young lady at the finance company."

The shirt was also allowed in evidence pursuant to the same limitation.

The defendant denied the robbery. He testified to being picked up by the police officers and to being in the lineup with two other men, one of whom was Spanish, and the other much taller than he. "\* \* \* neither one of them was not my description by any means."

He testified that one of the detectives asked him "Would you take a lie detector test?" and he answered "Certainly." At this point the prosecutor objected saying "It couldn't be admitted with regard to the results," and the court sustained the objection.

The defendant denied having a hat exactly like the exhibit hat. He acknowledged that the exhibit shirt was the shirt he was wearing when he was picked up. He denied owning sunglasses similar to the exhibit sunglasses. He stated that the first time he was in Public Finance Corporation's Office on the morning of November 12, 1962, was when the police officer brought him there for identification.

Lewis Spalla, a detective for the City of Tucson Police Department testified that he was on duty on November 12, 1962, between eight o'clock and five o'clock. The robbery here in question was the only robbery reported on East Broadway between the hours of nine o'clock and twelve noon.

During the hearing on the motion for new trial Deputy Sheriff James Rodriguez, testified that he received Persons' letter from the County Attorney's office, after which he interrogated Persons at the State

Prison. Persons acknowledged writing the letter. Rodriguez said Persons stated that he was involved in a robbery on Broadway opposite the Tucson Post Office. He also said Persons agreed to sign a written statement or plead to this crime if the prosecutor could arrange to have the sentence run concurrently with the one he was then serving.

Persons testified at the hearing that he went through Tucson between 10:00 and 11:00 A.M. on November 12, 1962, and stopped at the Post Office to mail a letter after which he walked past the Finance Company, looked in, walked back to his car and returned to the Finance Company. When he went into the Finance Company he was wearing a western hat, a pair of glasses. He "asked the lady to put her money in that sack." He had two sacks with him. She put the money in the sack. On cross examination Persons said he was in Florence for a "no fund check, bogus check" to which he pleaded guilty. He also testified that he had been convicted of felonies in Nebraska and in the State of Washington. He testified that on or about April 16, 1963, he was in the "fish tank" with the defendant and about eighty others until July. After July he did not see the defendant for three months, then they saw each other once in a while. He testified that he did not talk to the defendant about this crime until after he talked to Rodriguez. He testified that he never talked

to a police officer about signing a written confession but that he believed that he told Officer Rodriguez that he would sign a written confession and plead guilty to this crime if the sentence was to run concurrently with the sentence he was serving.

He testified that the robbery took place on November 12, 1962, when he was going from Phoenix to Nogales. With regard to his clothing the following testimony was elicited:

"Q. What type—on the day of the robbery that you committed—what type of clothes were you wearing? You said glasses before and something else?

"A. Well, this is sunglasses.

"Q. You had glasses on, sunglasses?

"A. Yes.

"Q. What else; what was the color of your clothes?

"A. I always wear plaid shirts. I don't have hardly anything else but plaid shirts. I had a plaid shirt on. I really don't recall my slacks I was wearing for sure. I have got a dozen pair of them.

"Q. You had slacks on? Do you know what color they were?

"A. They could have been green, but I have got a half a dozen pair of them.

"Q. When you committed this robbery down here, Mr. Persons, did you have any keys on you that day?

"A. Yes, I did.

"Q. What kind of keys?

"A. Just the car keys and the keys to the room and stuff like that.

"Q. Do you remember what type of key holder they were on?

"A. I carried them on a silver chain."

Persons was asked by the prosecutor whether he took a lie detector test, and he answered that he did not. The defendant's attorney objected on the ground that this was irrelevant and immaterial. The court overruled the defense counsel's objection stating:

"The state has a right to test the veracity of this witness concerning the statement in the letter and his testimony on direct."

Persons testified that he was asked to take a lie detector test but that he wouldn't take one, he was then asked:

"Q. Do you recall telling the officers, when you were interviewed by these two policemen here, concerning the lie detector test, you said, 'Fellows, this has gone too far. I want to see my lawyer.'

"A. No, I said, 'This thing has got big and I would like to have a lawyer be-fore I go any further.' That is when I found out that it was close to the same one I think both were mixed up in."

Persons also testified as follows:

"Q. Why wouldn't you take the lie detector test?

"A. I walked into the room and the first thing that one of these two men said is that he had taken the lie detector test, and the lie detector test showed that he was lying right through the nose, and I just supposed, according to that, that they could make it say anything that they wanted to.

"Q. Would you like to take one today?

"A. No.

"Q. How?

"A. No.

"Q. How about if we had your lawyer here?

"A. (No response.)

"Q. Do you know what the penalty is for perjury?

"A. I am not lying.

"Q. I am asking whether you are aware of that?

"A. I am aware of that.

"Q. Would you like to take your lie detector test with your lawyer present?

"A. No, I don't believe it is necessary.

"Q. How about if your lawyer approved of it, the operator, one of his choice, would you be ready to do it then?

"A. No, I don't think it would be necessary at all."

Over objection by the defense counsel Officer Spalla testified that he asked Persons would he be willing to submit to a polygraph test.

The state concedes that the defendant would be entitled to a new trial for newly discovered evidence if such evidence would render a different verdict reasonably probable upon retrial. The state maintains that it is discretionary with the trial judge to determine the believability of such evidence. The trial judge exercised his discretion in finding the testimony of Persons unbelievable or incredible.

We have held that Rule 310 of the Rules of Criminal Procedure requires a new trial for newly discovered evidence (1) if its introduction at the trial would probably have changed the verdict, and (2) if the defendant could not, with reasonable diligence, have discovered and produced it upon the first trial. State v. Hill, 88 Ariz. 33, 352 P.2d 699.

Here we have a situation in which the identification of the defendant as the man who committed the crime charged is wanting in specificity. The alleged victim was unable to say more than that the items admitted in evidence were similar to the clothes and accoutrements that the alleged robber wore on that day when she first saw him. There was nothing particularly unusual or distinguishing about these. When she saw the defendant he was wearing neither sunglasses nor the cowboy hat. She testified that she was unable to identify the defendant as the alleged robber when he was brought to her a few minutes after the alleged robbery. The defendant denied having committed the crime and he denied that the sunglasses or the hat were his. Apparently through two trials the jury was unable to determine beyond a reasonable doubt that the defendant committed the crime charged.

The credibility of the testimony is a question for the jury to determine. If the letter and the testimony of Persons were placed before a jury we believe that it is reasonably probable that the jury would arrive at a different verdict, if they believed such testimony. Certainly it was not cumulative testimony. In a very real sense it was newly discovered evidence.

The testimony with regard to whether Persons' would or would not take a lie detector test had no more place in the hearing on the motion for a new trial than in the trial itself. The court properly sus-

tained such an objection during the trial. We have held that the "technique [of polygraph tests] is not an accepted one among the scientists whose approval is a prerequisite to judicial recognition." Without a stipulation lie detector test evidence should not be received in an Arizona court for the present. State v. Valdez, 91 Ariz. 274, 371 P.2d 894. Thus this line of questions posed to Persons during the hearing with regard to whether he would or would not take a lie detector test was irrelevant, inadmissible and had no bearing on Persons' credibility.

As we said in Hunter v. State, 43 Ariz. 269, 30 P.2d 499:

"The third question is as to whether the trial court abused its discretion in refusing to grant a motion for a new trial. This motion was based on newly discovered evidence, and in support thereof the affidavit of one Turner O'Bryant was presented. It was to the effect that affiant was himself one of the four men who committed the crime with which Hunter was charged, and that he knew of his own knowledge that Hunter was not one of those men; that he had not communicated these facts to the defendant or his attorneys before the trial, because he did not wish to implicate himself at that time, and did not believe that Hunter would be convicted, since he was innocent, but that, after learning of Hunter's conviction, he pleaded guilty, and that, if a new trial was granted, he would testify to the facts stated in his affidavit. This evidence, if believed by the jury, would, of course, absolutely clear Hunter of the crime charged.

"The state admits that new trials should be granted when new evidence is discovered to the effect that another person is guilty of the crime of which the defendant has been convicted, but urges that the question of the sufficiency of the new evidence is purely discretionary with the trial court, citing Talley v. State, 18 Ariz. 309, 159 P. [58, 59], 64; Scheuer v. State, 31 Mont. 461, 78 P. 971, 80 P. 248; 20 R.C.L. 289. In the Talley case we said:

" '* * * To entitle the defendant to a new trial upon the ground of newly discovered evidence, it must appear from the affidavits presented that the new evidence is not cumulative merely, that it is such as to render a different verdict reasonably probable upon a retrial, and that the evidence could not with reasonable diligence have been discovered and produced at the trial.' "

"It is obvious that two of these requisites are satisfied by the affidavit. The evidence is not cumulative, nor could the defendant, with reasonable diligence, have discovered and produced it on his trial. The sole question

is whether it was such as to render a different verdict reasonably probable upon a retrial.

"The trial judge must have reached the conclusion that it was not probable that the evidence would change the verdict if the case were submitted to another jury and ordinarily we should not question his decision. In view, however, of the discrepancies in the identification of the defendant by the witnesses for the state, and the strength of the alibi offered by the defendant, we are inclined to think that, while it is not certain, it is probable that a different jury, with the additional evidence, would reach a different verdict.

\*    \*    \*    \*    \*    \*

"We think the correct rule is stated in People v. Kelleher, 2 Cal.Unrep.Cas. 821, 16 P. 705, wherein the court said:

" '\*  \* . \* The evidence upon which a conviction was had in this case is very weak, although there is sufficient to prevent this court from setting aside the verdict. In view of the testimony of the case, however, we think that the affidavits filed in support of the motion for a new trial on the ground of newly discovered evidence were sufficient to entitle the defendant to a new trial.' "

\*    \*    \*    \*    \*    \*

"We \* \* \* are of the opinion that, for the reasons above set forth, the trial court should have granted a new trial on the ground of newly discovered evidence."

As was said in People v. Williams, 57 Cal.2d 263, 18 Cal.Rptr. 729, 368 P.2d 353:

"It \* \* \* must be concluded that under the very unusual facts of this case it was an abuse of discretion for the trial court not to have granted defendant's motion for a new trial. It was said in People v. Reed, 27 Cal.App. 2d 484, at page 493, 81 P.2d 162, at page 167:

" 'For a guilty man to escape punishment is a miscarriage of justice, but for an innocent man to be convicted is unthinkable.' "

The judgment of the superior court is reversed and the case is remanded for new trial.

UDALL and McFARLAND, JJ., concurring.