560 A.2d 1137

Stanley Michael KOSMAS

v.

STATE of Maryland.

No. 8, Sept. Term, 1988.

Court of Appeals of Maryland.

July 25, 1989.

Russell J. White (Susan McMillan Davis, both on brief), Towson, Richard M. Karceski, Baltimore, argued, for petitioner.

Richard B. Rosenblatt, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., both on brief), Baltimore, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ.

McAULIFFE, Judge.

We reverse the murder conviction of this defendant because the introduction of evidence that he refused to take a lie detector examination prejudiced his case beyond the point that an instruction to disregard the testimony reasonably could be expected to effect a cure.

## I.

Stanley and Maria Kosmas were married in 1963 and had three children. Their marriage was harmonious for a number of years, but problems developed about the time Maria accepted employment outside the home. The defendant entertained suspicions that his wife was keeping company with one of her employers, and he hired a private detective, Edward Mattson, to conduct a surveillance. In February of 1985, Mattson, a retired Baltimore City police sergeant, found the suspected paramour, Aris Melissaratos, and Maria within a room of the Red Roof Inn in Anne Arundel County. Mattson called the defendant, who came to the scene, and there was a direct but nonviolent confrontation. Thereafter, in April of 1985, the defendant saw Maria and Melissaratos together in Maria's automobile, and gave chase. Catching them at a traffic light, the defendant smashed the window nearest Melissaratos, but caused no injury to him.

On December 20, 1985, Maria's body was found in her automobile, in the parking lot of an apartment complex two-tenths of a mile from the Kosmas home. Death was caused by ligature strangulation, and was believed to have

occurred one to three days earlier.[1] Maria's actions were accounted for until about 1:00 a.m. on December 17, when the defendant testified he spoke briefly with her at the family home. Throughout these events, and until her death, Maria had continued to reside at the family home, although she left the marital bed at some point. These facts are known. But, what was happening from February to December of 1985 between the defendant and his wife, and what may have transpired during this period between the defendant and others, is hotly disputed.

Michael Kosmas, the oldest of the three children, testified that his father was verbally and physically abusive to his mother, had at one point held a gun to her head, and had threatened to kill her if she left the family. Michael also said his father confided in him that he entered into a contract with Mattson to have Maria killed. Mattson testified that the defendant offered him $10,000 to have Maria killed while she was visiting her parents in Florida in the summer of 1985. Mattson said he first thought the defendant was joking, and humored him, but later believed the defendant was serious when he persisted in his request after Maria returned from Florida. Mattson admitted that when he was initially interviewed by the police following the discovery of Maria's body, he did not tell them of the "contract" discussions with the defendant, although he claimed that he had earlier warned Maria and Michael that the defendant had asked Mattson to kill her.

The defendant, a retired Baltimore County school teacher who was a co-owner of a restaurant, and who apparently enjoyed an excellent reputation in his business and home communities, testified that he had not threatened or abused his wife. He said he was upset by her transgressions, but wanted only to preserve his marriage and to keep the family unit intact. He adamantly denied having approached

---

1. Expert testimony offered by the State placed the probable time of death as December 17. A pathologist testifying for the defendant believed that death more likely occurred on December 18 or 19.

Mattson about having his wife killed and denied having told Michael that any such conversation took place.

Maria had been in the habit of working several nights a week keeping the books at the restaurant co-owned by her husband. On December 16, 1985, she relieved her husband at the restaurant during the early evening, and worked there until it closed at about midnight. Another restaurant employee drove Maria to her home, arriving there at about 12:30 or 12:45 a.m. Maria's automobile, which had been driven from the restaurant by the defendant, was parked in front of the home when they arrived. According to the defendant, Maria came into his bedroom at about that time, had a brief and unexceptional conversation with him, and left the room. The two younger Kosmas children were at home, and Michael arrived with friends at about 1:30 or 2:00 a.m. Maria was not seen again until Mattson discovered her body in her automobile on the morning of December 20.

Mattson was the second witness to testify in what was to become a five day trial.[2] In testifying to the events immediately surrounding his discovery of Maria's body, he said he first learned of her disappearance on December 17, when a friend of Maria's called; that on the following day, Maria's sister called him and sought his assistance in looking for Maria; that he called Melissaratos and the defendant and asked some questions, but did not do anything more because no one had retained him; that on December 19, Maria's mother, who had come to Baltimore from Florida, called and requested Mattson's services in locating her daughter; and, that on the morning of December 20, he met with Maria's mother and was retained by her. Mattson said he then went to the defendant's home, where he found the defendant being interviewed by a Baltimore County detective, whom he knew, and that he sat in on the balance of the interview. Testimony then proceeded as follows:

---

2. Trial took place in the Circuit Court for Somerset County, the case having been removed from Baltimore County at the request of the defendant.

MATTSON:.... I sat there and waited until they were done. Then [Detective] Pfouts went outside with Michael into his car.

PROSECUTOR: Did you talk with the defendant at that time?

MATTSON: I sure did.

PROSECUTOR: Had you been present when he was talking with Detective Pfouts?

MATTSON: I sure was.

PROSECUTOR: Could you hear what he was saying to Detective Pfouts?

MATTSON: Just the typical police interview, have you seen your wife, et cetera, et cetera. Do you have any idea where she might have been.

PROSECUTOR: And then you talked to the defendant?

MATTSON: Then I talked to [Kosmas]. I told him, I said, "Would you take a lie detector?" He said no.

Defendant's attorneys promptly approached the bench and requested a mistrial. The prosecutor argued only that "he is not a police officer. Obviously there are no results, no evidence of a polygraph being given. It is a question of what he said and his response." The trial judge denied the motion and sua sponte instructed the jury as follows:

Ladies and gentlemen of the jury, you will ignore any remark about a lie detector test. It has nothing to do with this case, and you will not consider it any more during the case and during your deliberations.

Following his conviction of second degree murder, the defendant appealed, contending among other things that he was seriously prejudiced by the testimony concerning his refusal to take a lie detector test, and that his motion for a mistrial should have been granted. The Court of Special Appeals affirmed the conviction in an unreported opinion, and we granted certiorari.

## II.

As the State readily concedes, evidence of the defendant's refusal to submit to a polygraph examination was

inadmissible. In a long line of cases anchored by the often quoted opinion of the Minnesota Supreme Court in *State v. Kolander,* 236 Minn. 209, 52 N.W.2d 458, 465 (1952), it is universally held that evidence of the defendant's willingness or unwillingness to submit to a lie detector examination is inadmissible. *Aetna Insurance Company v. Barnett Brothers, Inc.,* 289 F.2d 30, 34 (8th Cir.1961); *State v. Sneed,* 98 Ariz. 264, 403 P.2d 816, 820–21 (1965); *People v. Carter,* 48 Cal.2d 737, 312 P.2d 665, 674 (1957); *Mills v. People,* 139 Colo. 397, 339 P.2d 998, 999–1000 (1959); *State v. Chang,* 46 Hawaii 22, 374 P.2d 5, 12 (1962); *State v. Green,* 254 Iowa 1379, 121 N.W.2d 89, 91–92 (1963); *State v. Emory,* 190 Kan. 406, 375 P.2d 585, 588 (1962); *State v. Mottram,* 158 Me. 325, 184 A.2d 225, 229 (1962); *State v. Driver,* 38 N.J. 255, 183 A.2d 655, 658–60 (1962); *Commonwealth v. Saunders,* 386 Pa. 149, 125 A.2d 442, 445–46 (1956); *State v. Britt,* 235 S.C. 395, 111 S.E.2d 669, 685 (1959); *Schmunk v. State,* 714 P.2d 724, 732 (Wyo.1986); *State v. Faught,* 546 S.W.2d 515, 516–18 (Mo.App.1977); *State v. Hegel,* 9 Ohio App.2d 12, 222 N.E.2d 666, 668 (1964); *Bowen v. Eyman,* 324 F.Supp. 339, 341 (D.C.Ariz. 1970). *And see* Annot., *Propriety and Prejudicial Effect of Comment or Evidence as to Accused's Willingness to take Lie Detector Test,* 95 A.L.R.2d 819 (1964).

In a number of the earlier cases, prosecutors sought to distinguish the situation in which a defendant refused to submit to a polygraph examination from that involving witnesses other than the defendant who had taken or been offered such a test. The argument advanced was that a defendant's refusal could properly be treated as evidence of consciousness of guilt, and did not involve any implication of what the result of a test may have been. Rejecting that argument, Justice Traynor, writing for the Supreme Court of California in *People v. Carter, supra,* 312 P.2d at 674, said:

The suspect may refuse to take the test, not because he fears that it will reveal consciousness of guilt, but because it may record as a lie what is in fact the truth. A

guilty suspect, on the other hand, may be willing to hazard the test in the hope that it will erroneously record innocence, knowing that even if it does not the results cannot be used as evidence against him.

See also State v. Green, supra, 121 N.W.2d at 91, and State v. Kolander, supra, 52 N.W.2d at 465.

The questions we must consider then, deal with the damage likely to have been caused by the inadmissible evidence, and the efficacy of the trial judge's prompt instruction to disregard that evidence. Because we conclude that the damage in the form of prejudice to the defendant transcended the curative effect of the instruction, we reverse and remand for a new trial.

■ Ordinarily, the decision of whether to grant a motion for a mistrial rests in the discretion of the trial judge. Wilhelm v. State, 272 Md. 404, 429, 326 A.2d 707 (1974); Lusby v. State, 217 Md. 191, 195, 141 A.2d 893 (1958). In somewhat similar situations, involving mention of a lie detector test in connection with a witness other than the defendant, we have identified factors that should be considered in determining whether the evidence was so prejudicial that it denied the defendant a fair trial. In Guesfeird v. State, 300 Md. 653, 659, 480 A.2d 800 (1984), we said:

The factors that have been considered include: whether the reference to a lie detector was repeated or whether it was a single, isolated statement; whether the reference was solicited by counsel, or was an inadvertent and unresponsive statement; whether the witness making the reference is the principal witness upon whom the entire prosecution depends; whether credibility is a crucial issue; whether a great deal of other evidence exists; and, whether an inference as to the result of the test can be drawn.

As we also pointed out, these factors are not exclusive and do not themselves comprise the test. The question is

whether the prejudice to the defendant was so substantial that he was deprived of a fair trial, and the enumerated factors are simply helpful in the resolution of that question.

█ Borrowing from *Guesfeird* those factors that also have relevance to the inquiry we must make in this case, we first note that the reference to a lie detector test occurred only once, and that reference was promptly followed by the judge's instruction to the jury to disregard that evidence. The State argues that it is also in its favor that the statement was not solicited by the prosecutor, but was an inadvertent and unresponsive statement made by Mattson. Although it makes no difference in our ultimate determination of prejudice, we do not necessarily share the State's view that no blame should be assessed against it for the "blurt-out." We do not suggest that the prosecutor knew what Mattson's response would be when he asked if Mattson had spoken to the defendant on that occasion. It is conceivable that Mattson had not told the police or prosecutors about this alleged statement of the defendant when he was cooperating with them in the investigation or in preparation for trial. The indications are, however, that although Mattson was initially reluctant to discuss the matter with the police because he was apparently being considered as a suspect,[3] he rather promptly decided to give his full cooper-

3. Some information developed by the police indicated the deceased's automobile may not have been parked where it was found as early as December 17, but may have been brought there at a later time. Other information suggested the body may have been covered by a blanket for some period of time, but that the blanket had been removed shortly before Mattson announced he had found the vehicle. A man who fit Mattson's description and who was operating a vehicle similar to that owned by Mattson, was seen moving about the vehicle a day or two before the discovery of the body. Additionally, the police apparently harbored some suspicion concerning the fact that Mattson was able to locate the vehicle within five minutes of beginning his search for it, and the police were concerned by Mattson's delay in informing them of the alleged murder-for-hire discussions he had with the defendant. The evidence indicates that Mattson requested immunity from the State before he agreed to cooperate.

ation to the State,[4] while declining to speak to defense counsel. It seems the more likely possibility that if such a conversation with the defendant had occurred, Mattson would have told the police and prosecutors of it. If that fact was known to the prosecutor, he should not have posed the question, "and then you talked to the defendant?"

If we assume that the prosecutor did not know of the conversation concerning the lie detector, the State is still not entirely blameless in the matter, for Mattson was the State's witness, and if a State's witness intentionally injects inadmissible matter into a trial the State's case may thereby suffer. Mattson had been a Baltimore City police officer for fifteen years, attaining the rank of sergeant, and had been a private detective for an additional three and one-half years. It seems highly likely that he was aware that evidence concerning lie detectors was inadmissible, and it requires a generous nature to assume that his reference to the defendant's refusal to take a lie detector test was inadvertent. We are at least skeptical.[5]

More important, however, are the questions of whether credibility of the defendant was a crucial issue in the case, and whether the strength of the State's case was otherwise such that the prejudice resulting from the improper admission of the evidence may be considered insubstantial. On the first issue, it is clear that the defendant's credibility was critical to the success of his case. Much of the strength of the State's circumstantial evidence case depended upon the jury believing that the defendant had repeatedly threatened and abused his wife, and had attempted to contract for her

---

**4.** Cooperation of the ubiquitous Mattson included his agreement with the Baltimore County Police to be fitted with a "body wire" and to then engage the defendant in conversation. This was accomplished on December 22 or 23, but apparently yielded nothing of value to the State.

**5.** Ironically, the State had successfully argued a motion in limine to prevent defense counsel from cross-examining Mattson on the fact that Mattson had apparently failed a lie detector examination given in connection with this case.

murder. The defendant adamantly denied the truth of those allegations. Informing the jury that the defendant had refused to take a lie detector test cut to the heart of the defense. As the New Jersey Supreme Court said in *State v. Driver, supra*, 183 A.2d at 658:

> In [a circumstantial evidence case] particularly, to tell a jury of laymen at the very outset of the trial that defendant refused a number of times to take a lie detector test was to create a probable aura of prejudice which would permeate the proceeding to the very end.

Characterizing such information as possessing a "horrendous capacity for prejudice against the defendant," the New Jersey court treated as plain error the opening statement of a prosecutor which informed the jury of the defendant's refusal to take a lie detector test, and reversed the conviction even though there had been no objection by the defendant's attorney. To the same effect, *see State v. Kolander, supra*, 52 N.W.2d at 465, holding that "[w]here a conviction rests so completely on circumstantial evidence, the erroneous admission of such action on the part of defendant might well be enough to tip the scales against him."

Concerning the effect of the court's instruction to the jury to disregard this evidence, it is appropriate to recall the words of the Supreme Court in *Bruton v. United States*, 391 U.S. 123, 135, 88 S.Ct. 1620, 1627, 20 L.Ed.2d 476 (1968) that:

> there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored.

We conclude that this is such a case. The Supreme Court of Iowa reached a similar conclusion in *State v. Green, supra*, stating at 121 N.W.2d 91:

> It is true the trial court in the case at bar cautioned the jury that they were to pay no attention to what had been said, nor to the evidence which had been elicited as to the lie detector test. However, the difficulty with this situa-

tion is that even in the face of such caution by the court the poison still remains. It is akin to the placing of a nail in a board. The nail can be pulled out, but the hole made by the nail cannot be removed.

*And see Bowen v. Eyman, supra,* 324 F.Supp. at 342. *Compare, Stallings v. Commonwealth,* 556 S.W.2d 4, 5 (Ky.1977) (noting by way of dictum that admonition to jury was sufficient to render the error harmless).

We turn to the question of the weight of the other evidence against the defendant. In order to assess the strength of the State's case, we have found it necessary to examine virtually the entire transcript of the trial. There is, of course, evidence beyond that to which we have earlier referred. Some of this evidence tends to strengthen the State's case, and some tends to cast doubt as to what actually may have occurred.[6] Overall, it is fair to say that if Michael and Mattson are believed, the State has a strong circumstantial evidence case, but even then it is not overwhelming. If the defendant is believed in those areas in which his testimony conflicts with that of Michael and Mattson, the State's case is very weak. Again, then, it is apparent that the issue of the defendant's credibility is a central and crucial factor in this case, and the State's evidence that does not hinge at least in part upon the determination of that credibility is hardly of sufficient strength to permit us to find beyond a reasonable doubt that the inadmissible evidence did not in any way influence the verdict.

### III.

■ We address a second question raised by the petition because it is likely to recur. It involves evidence of the conduct and demeanor of the defendant upon being advised by the police that his wife was dead.

---

**6.** Although virtually all of the evidence presented at trial was known to the State within days of the discovery of Maria's body, there was no arrest or indictment in the case for more than three months.

Mattson found Maria's body sometime during the morning of December 20, and immediately notified the police. After the police conducted a preliminary investigation at the scene, Detective Milton Duckworth and Detective Pfouts went to the defendant's home at 2:20 p.m. to notify him of his wife's death. Detective Duckworth testified that almost immediately after being notified, the defendant asked the detectives to "please come with me," and escorted them to the master bedroom where the defendant handed Detective Duckworth the handset of a telephone and said, "please speak to him." Detective Duckworth asked the defendant who was on the line, and the defendant said, "a friend of mine." Detective Duckworth then spoke to the person on the line, who identified himself as Peter Angelos. Peter Angelos is an attorney who represented the defendant at the time, and was one of several attorneys representing him at trial.

In a hearing held out of the presence of the jury, defense counsel sought to exclude any testimony relating to what the defendant said or did upon being notified of the death of his wife. The prosecutor made it clear that he did not want to introduce any evidence of the substantive conversation between Detective Duckworth and Mr. Angelos, or the fact that the attorney had instructed his client not to answer any questions. The prosecutor argued that:

> We want the defendant's conduct that we think is unusual. It is a circumstantial case. It is a circumstance that I think is important. Anybody would say that that is an important circumstance.

The prosecutor had a valid point. An unemotional, business-as-usual response by the defendant to news of his wife's death would be unusual, and would support an inference that the defendant already knew his wife was dead, which in turn would support an inference that the defendant had something to do with her death. The difficulty here, however, is that defense counsel proffered to show, through the testimony of Mr. Angelos if necessary, that the police were not the first to notify the defendant of his

wife's death—that in fact Maria's parents were notified and then called the defendant to accuse him of murdering her—and that it was this call that prompted the defendant to place the call to Mr. Angelos which was in progress when the police came to the defendant's door. The importance of that proffer is that if it were true, the reason for the admissibility of the evidence of the defendant's conduct disappeared, because the conduct was no longer relevant. Implicit in the original argument of the State in favor of admissibility is the preliminary fact that the police notification was the first notification the defendant received. If it was not, his lack of instant response was unremarkable, and we are left only with the fact that a man accused of murder had called his attorney. The trial judge took the position that if the facts were as proffered by the defense, Mr. Angelos could so testify in the presence of the jury, and if his testimony were believed the inference would then be dissipated. In this, we believe, the trial judge chose the wrong course.

We are dealing here with a case of conditional relevance. The fact of the defendant's response may be relevant, but only if the defendant had not previously been notified of his wife's death. The State was the party offering the testimony. In order to show that the conduct of the defendant was relevant, it was incumbent upon the State to show that the notification of the defendant by Detectives Duckworth and Pfouts was the first notice that the defendant had received of the death of his wife. Given the circumstances, and in the absence of evidence to the contrary, perhaps one could reasonably assume the existence of the preliminary fact in question, i.e., that the police notification was indeed the first notice. However, as soon as there was evidence to the contrary, it was incumbent upon the trial judge to determine whether there was any true controversy surrounding the preliminary fact. *See* L. McLain, *Maryland Evidence,* § 104.2 (1987). If indeed there was such a controversy—if the State denied that Maria's parents had called and accused the defendant before the police arrived—then the

trial judge might have proceeded as he did, and allowed the jury to resolve the factual controversy. The procedure to be followed is outlined in *McCormick on Evidence* § 53, at 137 (E. Cleary 3d ed. 1984):

> The judge requires the proponent to bring forward evidence from which the jury could find the existence of the preliminary fact. The opposing party may then bring in disputing evidence. If on all the evidence the judge determines that the jury could not find the existence of the preliminary fact, he excludes the evidence. Otherwise, the question is for the jury.

*See also* J. Weinstein and M. Berger, *Weinstein's Evidence* § 104(09) (1988), stating that "[t]he judge must determine that a reasonable jury could make the requisite factual determination based on the evidence before it."

Here, there is no evidence of a controversy. Mr. Angelos, as an officer of the court, proffered the following information to the court:

> The police told the parents she had been found murdered. The police then told the parents that they were going to pay a visit to Mr. Kosmas. The parents, after the police had left, called Mr. Kosmas and said to him—mind you now, the police have not called the husband or told him anything. He doesn't know anything.
>
> The parents have been told by the Baltimore County Police, as I just stated, that the decedent was found in the vehicle murdered.
>
> The parents then called Kosmas as the police are on the way over and accused him of having killed his wife. They had gotten this from the police and the police were coming to get him.
>
> He then picks up the phone and calls me. I am prepared to testify to this, if the Court sees fit. He calls me and advises me of what has occurred.
>
> I tell him at that point in time under no circumstances, you are not to make any statements to anyone.

The prosecutor did not suggest that he had any evidence to the contrary. In that case, the assumption that might ordinarily be indulged as to the existence of the predicate fact that supported the admission of the evidence was no longer available. It simply was not reasonable to assume that the police were making the first notification when the unchallenged proffer of Mr. Angelos was directly to the contrary.

The danger of prejudice to the defendant was real. Not only would the unfavorable inference be permitted to repose in the minds of the jury until the defense could reach its case and show that matters were not as they might have first appeared, but one of the defense attorneys might unnecessarily have been placed in the awkward and difficult position of testifying before the jury,[7] and he might have been required to explain his advice to the defendant regarding silence in order to explain the otherwise seemingly stoic and somewhat strange and uncommunicative conduct of the defendant. This dangerous ground, which may have to be trod if there is a genuine dispute as to when the notification was made, may be entirely avoided if there is no real dispute of fact. On retrial, if the question is again raised, the trial judge should accept the proffer or testimony of Mr. Angelos, and then call upon the prosecutor to proffer evidence to the contrary. If there is none, the evidence of the defendant's conduct and his call to Mr. Angelos should not be admitted.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR SOMERSET COUNTY AND TO REMAND THE CASE TO THAT COURT FOR A NEW TRIAL; COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY BALTIMORE COUNTY, MARYLAND.

---

7. *See* Rule 3.7, *The Maryland Lawyers' Rules of Professional Conduct.*