785 A.2d 865

**Dean James PANTAZES**

v.

**STATE of Maryland.**

**No. 2500, Sept. Term, 2000.**

Court of Special Appeals of Maryland.

Nov. 30, 2001.

Paul Mark Sandler (Robert B. Levin and Freishtat & Sandler, on the brief), Baltimore, for appellant.

Diane E. Keller, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, Baltimore, and Leonard Collins, Jr., State's Attorney for Charles County, LaPlata, on the brief), for appellee.

Argued before SALMON, ADKINS, and MARVIN H. SMITH (Retired, Specially Assigned), JJ.

ADKINS, Judge.

On the morning of March 30, 2000, when Clara Pantazes ("Mrs. Pantazes") entered her garage to leave for work at the bail bond company that she and her husband operated, a stranger shot her three times at close range. The State charged that Dean James Pantazes, appellant, hired Jermel Chambers, a heroin-addicted prostitute, to murder his wife, and then take her jewelry, purse, and Jeep to make the murder look like a random robbery and shooting. The State accused Pantazes of driving Chambers to his house in Upper Marlboro, opening the garage door, and instructing Chambers to shoot his wife with a gun that he left under a towel on top of the garage refrigerator. According to the State, Pantazes then closed the garage door, leaving Chambers inside to lie in wait for his wife of more than twenty years. The proffered motive was that Clara Pantazes may have been contemplating a divorce that Pantazes believed would cost him too dearly.

Pantazes denied that he had anything to do with the murder. At trial, the State's star witness was Chambers, who admitted murdering and robbing Mrs. Pantazes in exchange for $11,000 from Pantazes. The primary corroborating witness was "Kim" Young,[1] a prostitute who claimed that Pan-

---

1. Young was known as Kevin Young until she changed her name. She testified that she is a man, but prefers to dress and be addressed as a

tazes separately solicited her to do the killing. A Charles County jury convicted Pantazes on seven counts, including first degree murder, first degree felony murder, and conspiracy to commit first degree murder.[2]

In this appeal, Pantazes demands a new trial because Young blurted out that she had taken a lie detector test, and Chambers, in an emotional outburst from the witness stand, shouted to Pantazes, "You are going to kill the children next. Tell them that. The two of them were next for you." We conclude that the lie detector remark merited a mistrial, and therefore, do not address whether the emotional outburst did as well.

## FACTS AND LEGAL PROCEEDINGS

The only witness to the events was the admitted shooter, Jermel Chambers. Chambers pleaded guilty to the first degree murder of Mrs. Pantazes in return for the State's agreement not to seek the death penalty. She said that she was hired by Pantazes to kill his wife. He drove her to the Pantazes' house on the morning of March 30, where she shot Mrs. Pantazes with a gun left there by Pantazes. Chambers, a prostitute and drug addict, was first approached by Pantazes on the street in January 2000. Pantazes, who was driving a big green truck and introduced himself as "Steve," inquired how much oral sex would cost. When Pantazes agreed to pay the forty dollar price quoted, Pantazes took her to a house on K Street, "which is right across the DC line," and they had oral sex. For an additional sum of fifty dollars, they had vaginal sex, and, according to Chambers, Pantazes "said he wanted to see me as a regular, so he wouldn't have to go with different girls." Chambers described the K Street house as having a brown door, with blue carpeting on the first floor.

woman. At times, she is known as "MeMe." It was agreed at trial that Young would be referred to in the feminine gender. In this appeal, the parties and this Court have continued to do so.

**2.** After the conviction, the State dropped its death penalty request.

Chambers testified that the topic of murder came up in their first meeting:

> He told me something about a boss' wife of his, his boss' wife. Anyway, he indicated that she was going to be running off and leaving him and taking almost everything that he had. And his boss, when he was indicated to do him or to do her.

The next time they met, Chambers said, "he told me the whole story then."

> He said his boss' wife was going to divorce him and was sleeping around with his best friend, and she was going to get everything that he had. And he would pay someone almost whatever they asked for to do her. That is how he said it.

Chambers told Pantazes that she "would look around and see if [she] knew anybody." They continued to meet, and engaged in sexual activity between six and eight times, always at the K Street house. During these encounters, they would talk "[a]bout this job being done. Getting his boss' wife killed." Chambers described herself as "very high" on these occasions.

Chambers testified that after Pantazes paid her $5,000 in cash, wrapped in a money wrapper, they continued to talk about the murder. When he asked, one evening in February, how much it would cost for her to do the murder, she told him $6,000 more. On March 29, they met in his truck, and agreed to meet again at a convenience store the next morning. Early that morning, Chambers got into Pantazes' truck, and he drove her to his house on Kenfield Lane, in an affluent neighborhood in Upper Marlboro, arriving at 7:45 a.m.

> He opened the garage door. He then told me to come in. I went into the garage. We were standing there kind of going back at each other. . . . He was telling me the gun was on top of the refrigerator. He handed me the gloves. He told me to sit on a milk crate that is behind the cooler that is in his basement, or is in his garage.

Then, Chambers learned for the first time that there was no "boss" and Pantazes' wife was to be the victim.

> He told me she would be coming out before ten o'clock, because she had an appointment. He said she was in the shower. When he said that to me, I knew that he was lying. That he was really Dino ... the boss. Whoever he said his boss was. I figured it out when he said she is in the shower right now. She'll come out. She'll put the dog in.

Pantazes left Chambers inside the garage and closed the door. According to Chambers, she could not leave because she did not know how to reopen the garage door.

When Mrs. Pantazes came out of the house, she saw Chambers, and they exchanged words. Mrs. Pantazes asked Chambers what she was doing in her house, and Chambers replied that a man named Steve had let her in. Chambers begged Mrs. Pantazes to let her leave the garage, without telling the police she had been there. After Mrs. Pantazes said she was going to call the police, Chambers shot her three times. She then prepared the scene to look like a robbery had occurred.

> I grabbed everything and did like he told me to do, make it look like a robbery. And he said he would put cigarette butts and hair and all around her to mess up the scene for the cops before they got there.... I finally figured out how to get out. There was a remote control on the visor [of Mrs. Pantazes' car].

Chambers recounted that she drove away in Mrs. Pantazes' Jeep, and headed back to the District of Columbia. She took with her the gun, and Mrs. Pantazes' ring and Rolex watch. She said that she called Pantazes with the cell phone she found in Mrs. Pantazes' car, and "told him it was done." She left the car in the District of Columbia.

Chambers recounted that after the murder, she called Pantazes twice and asked for the balance of the sum promised her to do the murder. In the second call, she "made it very clear to him that if he didn't give me my money, you know, he was going to have repercussions behind it." Pantazes replied, "[You] didn't ... do it right."

On cross-examination of Chambers, the defense brought out her long term history of prostitution. Chambers also admit-

ted that she had lied on numerous occasions to police and court agencies about her name and address. She admitted that the details of her testimony about what happened inside the Pantazes' garage were inconsistent with her previous statements to the police. The defense also established that she had worked occasionally as a bounty hunter. Chambers explained that a bounty hunter is "a person that retrieves fugitives or persons that have run away and are on bond." She denied having worked as a bounty hunter for Pantazes. Although she had been to the bail bond office where "Steve" worked, she denied knowing that he was a bail bondsman until three months after she was incarcerated.

The State's chief corroborating witness was Kim Young, also a prostitute. Although she worked in the same general area of Eastern Avenue as Chambers, and had seen Chambers on the streets, Young denied having any relationship with Chambers. Young said she met Pantazes, who called himself "Steve," in December 1999 when she was working by Paul's Liquor Store. She flagged him down in his "big old truck" to offer him sex. She got in his car, where the two had oral sex, for which he paid her twenty dollars plus a twenty dollar tip.

According to Young, when Pantazes was driving Young back to the area of the liquor store to drop her off, he mentioned that he was looking for someone to commit a contract murder.

[H]e said this old man wants this woman killed, and I said why.... [H]e said because she's like a bitch.... I said how do you want her killed. He said well, she go to work at 9, best do it in the morning. That way no one will be home. He said when she comes out, she comes out between 9:00 and 9:30 like that. I said oh. And you shoot her, take the Jeep, her Cherokee, her Jeep and get rid of it[.]

Young testified that Pantazes offered her $10,000 to "do it," but she declined, because she was afraid of guns. When he asked her to look for "one of those young hustlers," Young gave him her telephone number. Pantazes called Young frequently after their first meeting.

Young testified that the next time they met, in January 2000, Pantazes had murder on his mind. "[W]e talked about the murder, the plot again.... [H]e said I want it done quickly. Did you find somebody. I said yes, I found somebody." Young explained that she had not, in fact, found anyone, but rather, "was playing with him." "Stringing him along," she told him, "I met this guy K." When Pantazes heard this, "he said give K the address," and gave Young a small card with an address on it.

When they met a third time, Young recounted, Pantazes paid her for oral sex, and Young continued the fiction about "K."

Q: While you were with him that night did you have any further discussions about this murder? . . .

A: I said K he can't do it in the morning. He wanted to do it at night. He said, well, she worked late in Upper Marlboro, but you can't do it. It's too many cops be around. She only works late on Wednesday.

Young testified that in their fourth meeting, around February, Pantazes again paid Young for oral sex. He then gave Young a yellow piece of paper containing his home address, on Kenfield Lane, Upper Marlboro, and the access code to his garage. The typed paper also provided directions to Pantazes' house. He told Young to give the paper to K. After the murder, the police searched Young's apartment for the paper, but did not find it. After the search, Young found the paper, and turned it over to police, saying that her brother had used it as scrap paper. Young related in her testimony that the paper was found in her brother's room, which was not searched by the police because her brother was asleep at the time of their search. The yellow piece of paper was introduced as an exhibit.

According to Young, during one of their meetings, Pantazes shared with Young his plan for how the murder would happen.

He said when she comes out of her garage about 9, between 9 o'clock, that he will have—he told me he'll have the garage cracked opened, . . . because he the only one with access to

the house. He said he'll be out of town. He said he'll be out of town when it happens, but he want her shot and want truck taken to southeast or anywhere, blown up, set on fire.

On another occasion, Pantazes brought a large amount of money to their meeting.

[Young]: I got in the truck with him and he had a box, a multi color box with two knots of money in it. . . . And he said you think I'm joking, look. I told you I got to get this done very fast. I said sweetheart, I can't find him, like that.

Q: You can't find K?

A: K.

Young testified that a box that the police found at Pantazes' home, and which was introduced into evidence, looked like the one that held the money. She also explained that at the time Pantazes showed her the box, he said: "I have to get rid of this money before my son finds it and spends it, my son and my wife find it and spend it."

Young recounted that the last time she met with Pantazes was sometime in March 2000. On March 30, 2000, Young heard about Mrs. Pantazes' murder on television, and contacted the police.

[T]he news was about to come on and the lady said, one of the anchors said a woman was murdered in an Upper Marlboro home, in the garage, and I said, oh, my God, he done found somebody to kill that woman, and I said—I woke my little brother up. I said little Bobby, get up. This is the same plan this man told me about, a woman being killed in a garage. I said watch if she say a truck is missing. Indeed they said a truck is missing. . . . I waited until 10 o'clock that night, about 10, about 10:15, 10:30 that night, because the [police officer] was coming in to work. I think he was coming in, and I said I know about that murder plot that happened in Upper Marlboro.

She identified Pantazes as a "big, heavy set, looked like a Puerto Rican man, Spanish man. He got a big belly, always wear jeans and striped shirt, checkered shirt and got a

mustache, always smoke cigars." Young was taken to the police station, where she gave a statement and identified Pantazes from a group of photographs. She testified that although she did not ask for money from the police, later she was given $1,000 from Crime Solvers.

On cross-examination, Young acknowledged a prior conviction for theft and for prostitution. She also acknowledged that she "love[d] money," and had been paid by the police several times during the period she was giving statements and cooperating with them.[3] Police assisted in getting her the $1,000 from Crime Solvers.

The State offered additional corroborative evidence. Police testified that the garage at the Pantazes home showed no signs of forced entry, corroborating Chambers' testimony that Pantazes let her into the garage. Two weeks after the murder, Young, under police supervision, made a tape-recorded telephone call to Pantazes at his office. During the call, Young accused Pantazes of the murder and referred to the yellow sheet of paper that Pantazes had given her with directions to his house and the code to open his garage. In this taped conversation, Pantazes insisted that he did not know Young. Nonetheless, Pantazes told Young he would "pay for some information." When Young asked Pantazes to meet her at Paul's Liquor Store, Pantazes repeatedly claimed that he did not know where Paul's was located. Yet an employee at Paul's identified a photograph of Pantazes as that of a man who regularly came to Paul's in a green Suburban. According to the employee, during the early part of the year, Pantazes would sit in his Suburban outside Paul's "every night to every other night." Sometimes Pantazes would come into Paul's and purchase soda and chips.

Shortly after the monitored telephone call, Pantazes met Young at Paul's Liquor. During their conversation, which was

---

3. The police paid her $300 after she made her first statement. She received an additional $150 on April 11; $110 on April 27; and $40 on September 20. The police also paid for a phone at her apartment, and tried to help her find an apartment when she was evicted.

also recorded, he remarked that he felt as if he were under surveillance. He still maintained that he did not know Young, but paid her $1,300 for information. Young denied giving any information to Pantazes, and Pantazes did not pass on any information from Young to the police.

Telephone records showed that between December and March, Pantazes made thirty-one calls to Young's telephone number. When police searched Pantazes' bail bond office on May 23, they located a piece of paper with Young's phone number on it under the blotter on Pantazes' desk. In addition, telephone records showed that between January and March, Pantazes made fourteen calls to Chambers. Chambers' cousin, who lived with Chambers, recalled that a man identifying himself as "Steve," a "white guy" with a high-pitched voice, made about a "half dozen" calls asking for Chambers. When Chambers' cousin produced "Steve's" phone number, which she had written on a sheet of paper, it turned out to be Pantazes' cell phone number. Another relative confirmed that the same person called for Chambers several times, including twice on the relative's birthday.

On the date of the murder, Pantazes talked to the police, and provided them with a detailed recitation of his whereabouts throughout the day. Although Pantazes claimed to have done work on a federally-owned property in Mt. Laurel early that morning, he had not signed a visitor's list for the property, as was required by the federal government. The State also introduced evidence regarding the distances and driving time from the stops Pantazes claimed that he made that morning, and argued that Pantazes had sufficient time (40 minutes) to pick up Chambers and drive her to his home, even if he did go to the Mt. Laurel property. The State also introduced Pantazes' recorded statement that a few people knew the code to the garage, and established that there was no evidence of a forced entry into the Pantazes' garage.

Regarding motive, the State introduced a letter written by the Pantazes' son indicating that there had been some marital discord. He testified that he left the letter in his father's

truck sometime in September 1999. His mother had called him at college, and during their conversation, revealed that she had argued with Pantazes. The letter indicated that the disagreement had been serious.

My entire life I have looked up to you.... I honestly don't know what to say right now. I have never been so hurt as I am. When I talked to Mom this morning and heard her cry I didn't care who was at fault, I just wanted to get this settled....

Driving home I didn't think at all .... but when I got home I realized my world had crashed down.... I always thought our family was unbreakable.... I am proud to call you dad but upset because it seems as though you forgot where your home is.

Telephone records also established that a ten-second phone call was made from the victim's cell phone to Pantazes' cell phone at 9:40 on the morning of the murder. Although defense counsel argued that this phone call might have been placed by Mrs. Pantazes in a cry for help, the State introduced telephone company records to show that it was more likely placed from a location near Washington, not from the Pantazes house.

A college student who lived near the K Street townhouse corroborated Chambers' testimony that she and Pantazes went to the townhouse to have sex. The student remembered that, on two or three occasions in "about March," he saw two people entering a vacant townhouse on K Street. The man was heavy set, white, and drove a "big green Suburban," and the woman was 5'7", "disoriented, her clothes was torn. She looked like a crack head." The State showed that Pantazes had access to a house in that block, and that the interior of that house matched Chambers' description of the K Street house where Pantazes took her.

The defense presented numerous witnesses, including Mrs. Pantazes' mother and sister, who stated that Pantazes' relationship with his wife was very happy. In response to the State's evidence of phone calls to Chambers, the defense

offered the testimony of James Verapapa, a bondsman who shared offices with Mr. and Mrs. Pantazes, and joint ventured with them on large bonds. Verapapa explained that a "jumper" was a person for whom they posted a bond, but who failed to appear in court at the appointed time. If this occurred, the bondsman would forfeit the bond amount, unless he could locate and bring the person to court within a set time period. Verapapa reported that when making calls to locate a jumper, he and Pantazes would usually use a false name.

The defense suggested to the jury that Pantazes made the calls to Chambers and Young, and falsely identified himself as "Steve" because he was trying to obtain information about a jumper. During the time period of Pantazes' calls to Chambers and Young, Pantazes and Verapapa were looking for a jumper, an exotic dancer who was reported to be working in New Jersey or Philadelphia. Verapapa testified that although there was no evidence that the jumper was living or working locally, both of the Pantazes and he did make some local calls to look for her. He acknowledged, however, that when he testified before the grand jury, he said that Mrs. Pantazes was doing the "office work" on that jumper, that Pantazes was not working the case, and that in fact the F.B.I. told them "not to work the case" because that person was the subject of a federal investigation.

In an effort to create reasonable doubt, the defense also challenged the State's time line of Pantazes' movements on the morning of the murder. In addition, it presented a witness who saw Young and Chambers together the summer before the murder, in an effort to suggest that Young and Chambers may have framed Pantazes.

## DISCUSSION

■ "The results of a lie detector test, as well as the fact of taking such a test, are not admissible." *Guesfeird v. State,* 300 Md. 653, 658, 480 A.2d 800 (1984). There is good reason for the exclusion of lie detector or polygraph evidence.

The reliability of such tests has not been established to our satisfaction, and we have consistently refused to permit evidence with regard to them. In our system of criminal justice, the trier of fact is the lie detector, and we have been steadfast in disallowing that function to be usurped by a process we have not found to be trustworthy. Mention at a criminal trial of the results of a polygraph test, or the taking of the test, or the willingness or unwillingness to take the test, raises the specter of reversal. In criminal prosecutions, the polygraph test is a pariah; "polygraph" is a dirty word.

*State v. Hawkins,* 326 Md. 270, 275, 604 A.2d 489 (1992) (citations omitted). *See generally* Michelle M. Gee, Annotation, *Propriety and Prejudicial Effect of Informing Jury that Witness in Criminal Prosecution Has Taken Polygraph Test,* 15 A.L.R.4th 824 (2000).

Midway through her cross-examination, Young was asked: "You had talked to a number of police officers during that night and early morning hours and into the afternoon." Young responded, "Yes. I kept falling asleep, because I had to take a lie detector test and all that."

After Young's testimony on cross-examination, redirect, and re-cross, defense counsel asked to approach the bench. Noting that Young had "said she was given a lie detector," defense counsel asserted that he had "received nothing in discovery" about the lie detector test. The prosecutor replied that he was not "aware of that" but would find out during the noon recess.

After the State located and for the first time gave defense counsel the results of a voice stress analysis,[4] defense counsel moved for a mistrial, arguing that the testimony was prejudicial because "the most important facts of this case are the

---

4. The State asserted, and defense agreed, that the State had not acted in bad faith in neglecting to disclose the voice stress test. The prosecutor explained that the officer who performed the test put it in his file, and "it just really never made it into the main case file. I apologize for that[.]"

credibility of Jermel Chambers and Kim Young." The defense emphasized that had the State provided the information about the lie detector test in discovery, the lie detector testimony could have been prevented through a motion *in limine* and appropriate instructions to counsel and to the witness. Defense counsel also pointed out that if he had received the lie detector information in discovery, he could have "cross-examined around it."

The prosecutor admitted that the State had failed to furnish the discovery. Nonetheless, he argued, the nondisclosure did not justify a new trial.

Although defense counsel insisted that a new trial was the only just remedy, the trial court denied the mistrial. Instead, at the close of the evidence, the court gave a curative instruction.[5] Defense counsel objected to the instruction, and moved again for a mistrial.

On appeal, Pantazes argues that if "the lie detector test had been disclosed, both the defense strategy and the results of the trial would have been different, i.e. the jury would never have been exposed to Young's prejudicial, inadmissible lie detector testimony." He contends that his conviction must be reversed because the discovery violation tainted both his trial strategy and the case that was put before the jury.

Pantazes offers three rationales for reversal. First, he complains that the State's failure to produce information about the voice stress analysis in discovery, in violation of Md. Rule 4–263(b)(4), prejudiced Pantazes because it prevented the defense from taking steps to ensure that the jury did not learn that Young had taken a lie detector test. Second, he contends

---

5. The Court instructed the jury that

another prosecution witness during cross-examination by the defense blurted out a claim that the witness had taken a lie detector test. There is no machine that exists that can reliably determine if a person has told or is telling the truth, and we don't let that kind of evidence in these cases. And in this case you're instructed that the witness never took a test on any matter relevant to the witnesses's testimony in this case. So you are not to infer that that witness was truthful simply because that witness took a lie detector test.

that the lie detector testimony so prejudiced the jury that no curative instruction could correct it. Third, he claims that even if the remark could have been remedied by a curative instruction, the trial court's instruction in this case only "compounded the problem."

We do not follow Pantazes' approach of resolving this case by conducting three separate, compartmentalized examinations of the discovery violation, the lie detector remark, and the curative instruction, using three different standards of review. The record here establishes that the State's failure to provide the defense with Young's lie detector test information prevented the defense from filing a motion *in limine* in order to avert any mention of a lie detector test in front of the jury. In these circumstances—when the discovery violation directly leads to inadmissible testimony about a lie detector test—the taint from the discovery violation cannot be "detached" from the lie detector remark, because the harm caused by the discovery violation was the remark itself.

Nor do we accept the State's contention that we should resolve this case by applying the usual standard of review that governs the determination of whether a lie detector remark "so prejudiced the defendant that it deprived him of a fair trial." *Guesfeird*, 300 Md. at 659, 480 A.2d 800. For the reasons set forth below, we conclude the appropriate standard for our review of a discovery violation resulting in inadmissible lie detector testimony is the "harmless error" standard.[6]

---

6. Pantazes' motion for a mistrial was not made as a direct objection to the admission of Young's lie detector testimony under Md. Rule 4–323(a), which requires that the objection "shall be made at the time the evidence is offered or as soon thereafter as the grounds for the objection become apparent." Instead, the motion was a request for relief under Md. Rule 4–263(i), which provides that "if at any time during the proceedings the court finds that a party has failed to comply with this [discovery] Rule ..., the court may order that party to permit the discovery of the matters not previously disclosed, ... grant a mistrial, or enter any other order appropriate under the circumstances." Under Md. Rule 4–323(c), which governs objections to rulings on matters other than the admission of evidence, "[f]or purposes of review ... on

Although this case presents a closer question than the Maryland precedent that guides our review, ultimately we cannot say beyond a reasonable doubt that the "double-barreled prejudice" resulting from the discovery violation and the lie detector remark did not affect the guilty verdict in this case. As we explain below, that conclusion requires us to vacate the conviction, and remand for a new trial.

## I.

### The Standard Of Review For A Discovery Violation Resulting In A Lie Detector Remark Is "Harmless Error"

 Maryland Rule 4–263(b)(4) defines the State's discovery obligations in criminal prosecutions. It requires that upon the request of the defendant, the State shall produce "the results of any ... scientific test[.]" A lie detector test is a scientific test that must be produced under this rule. *See Patrick v. State,* 329 Md. 24, 35–36, 617 A.2d 215 (1992). There is no distinction, for purposes of discovery, between scientific tests administered to witnesses or to the accused. *See id.* Nor does the rule condition the discovery of scientific tests upon their admissibility as evidence, or upon a showing that the results of the tests are material to the preparation of the defense and intended for use by the State. *See id.* at 35, 617 A.2d 215. Even an unintentional failure to provide discoverable lie detector information may constitute a discovery violation. *See Williams v. State,* 364 Md. 160, 177, 771 A.2d 1082 (2001).

---

appeal ..., it is sufficient that a party, at the time the ruling or order is made or sought, makes known to the court the action that the party desires the court to take or the objection to the action of the court." Here, Pantazes moved for a mistrial based on the discovery violation and its resulting prejudice, then objected to the trial court's denial of a mistrial. In these circumstances, Pantazes adequately preserved for appellate review the question of whether the trial court should have granted a mistrial. Moreover, the State has not argued any waiver by Pantazes.

When a discovery violation occurs, "[u]pon an independent review of the record, we must be able to declare, beyond a reasonable doubt, that the [violation] in no way influenced the verdict. . . ." *Id.* at 179, 771 A.2d 1082. The State bears that heavy burden of proof. *See id.* In *Williams,* the Court of Appeals recently applied this "harmless error" standard of appellate review in holding that a discovery violation resulting in the admission of harmful identification testimony required a mistrial. *See id.* at 180–81, 771 A.2d 1082.

In doing so, the Court emphasized the policy reasons for mandatory disclosure in criminal cases. The discovery rules "are not mere guides but are 'precise rubrics' to be strictly followed." *Id.* at 171, 771 A.2d 1082. The "major objectives" of mandatory disclosure are "to assist defendants in preparing their defense and to protect them from unfair surprise" at trial. *Id.* at 172, 771 A.2d 1082. Specifically, the mandatory disclosure rule "facilitate[s] . . . effective cross-examination" and allows the defense to determine "whether certain motions can be filed prior to trial" in order to "protect [the defendant] from surprise" at trial. *Id.* at 172, 174, 771 A.2d 1082.

Using the most stringent standard of appellate review to examine the prejudicial effect of a discovery violation promotes these objectives and prevents the State from being "the recipient of the unquestionable windfall that resulted from its own clear violation of the discovery rules." *Id.* at 176, 771 A.2d 1082. Accordingly, we review the prejudice resulting from a discovery violation on a harmless error standard. *See Williams,* 364 Md. at 179, 771 A.2d 1082.

[W]hen an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed "harmless" and a reversal is mandated. Such reviewing court must thus be satisfied that there is no reasonable possibility that the evidence com-

plained of—whether erroneously admitted or excluded—may have contributed to the rendition of the guilty verdict. *Dorsey v. State*, 276 Md. 638, 659, 350 A.2d 665 (1976).

■ In contrast, when a witness makes a lie detector remark to the jury, "the question is whether the reference to taking a lie detector test by the ... witness so clearly prejudiced the appellant that a motion for mistrial should have been granted." *Guesfeird*, 300 Md. at 658, 480 A.2d 800. We give deference to the trial court's assessment of the prejudicial effect that a lie detector remark had on the jury, because that court is in a better position to evaluate its impact on the jury in the context of the witness' entire testimony and the trial as a whole. *See, e.g., Hawkins*, 326 Md. at 278, 604 A.2d 489 ("The fundamental rationale in leaving the matter of prejudice *vel non* to the sound discretion of the trial judge is that the judge is in the best position to evaluate it").

In *Guesfeird v. State*, 300 Md. 653, 480 A.2d 800 (1984), the seminal case addressing prejudice resulting from lie detector testimony to a jury, the Court of Appeals directed courts to consider a number of factors in assessing such prejudice.

In determining whether evidence of a lie detector test was so prejudicial that it denied the defendant a fair trial, courts have looked at many factors. The factors that had been considered include: whether the reference to a lie detector was repeated or whether it was a single, isolated statement; whether the reference was solicited by counsel, or was an inadvertent and unresponsive statement; whether the witness making the reference is the principal witness upon whom the entire prosecution depends; whether credibility is a crucial issue; whether a great deal of other evidence exists; and, whether an inference as to the result of the test can be drawn.

*Id.* at 659, 480 A.2d 800.

We think it is correct to say that in both discovery violation and lie detector cases, courts must examine the prejudicial effect of the impermissible conduct in question. In assessing the prejudicial effect of a discovery violation, however, the

term "prejudice" is tied to the stricter harmless error standard, and requires a showing that beyond a reasonable doubt, the defendant suffered no harm from the violation. *See Williams*, 364 Md. at 179, 771 A.2d 1082. In contrast, when we assess the prejudicial effect of a "straight" lie detector remark, the term "prejudice" is measured by the more deferential standard.

This case, however, involves both a discovery violation and a *related* lie detector remark. We are reviewing the trial court's decision to remedy a discovery violation *that resulted in* a lie detector blurt with a curative instruction to the jury, rather than a mistrial. The link between the discovery violation and the lie detector testimony in this case raises a question about the appropriate standard of review. Although a lie detector blurt in front of the jury may be an anticipated consequence of the State's failure to disclose the fact and results of a witness's lie detector test, we found no Maryland case addressing these circumstances. *Cf. Patrick*, 329 Md. at 36–37, 617 A.2d 215 (discovery violation regarding lie detector information that was not presented to the jury).

Applying *Williams* in this new context, we conclude that the appropriate standard of review is the more stringent "harmless error" standard. A lesser standard would reward the State with an inappropriate "windfall" from its violation of the discovery rules—*i.e.*, having the inadmissible lie detector testimony evaluated under a less stringent standard of appellate review. *See Williams*, 364 Md. at 176, 771 A.2d 1082. *Williams* teaches that we must assess the effect of the lie detector testimony under a harmless error standard, because doing so promotes the policy and purpose of the mandatory disclosure—*"to assist the defendant in preparing his defense and prevent unfair surprise at trial." Id.* at 178, 771 A.2d 1082 (emphasis in original).

In adopting this standard of review, we recognize that in cases involving discovery violations and lie detector testimony, the Court of Appeals has used language suggesting that appellate review of the denial of a mistrial should focus on the

trial court's exercise of its discretion to fashion a remedy. In the context of discovery violations, the *Williams* Court recently stated that

> the remedy ... for a violation of the discovery rule is, in the first instance, within the sound discretion of the trial judge. The exercise of that discretion includes evaluating whether a discovery violation has caused prejudice. Generally, unless we find that the lower court abused its discretion, we will not reverse.

*Williams,* 364 Md. at 178, 771 A.2d 1082 (citations omitted) (but reviewing a police officer's surprise identification testimony at trial, which was not disclosed in discovery, under a harmless error standard). We acknowledge that this language raises some uncertainty about the appropriate standard of review. For the reasons we explained above, we have resolved this uncertainty in Pantazes' favor, by applying the harmless error standard of review.[7]

 We turn now to the mechanics of that review. To determine whether there is a reasonable possibility that the jury's verdict was influenced by the inadmissible testimony, we are required to examine all of the evidence in the case. The Court of Appeals, in conducting harmless error analysis, consistently has assessed the impact that the disputed evidence reasonably could be expected to have had on the jury. *See Brown v. State,* 364 Md. 37, 41–42, 770 A.2d 679 (2001); *Ware v. State,* 360 Md. 650, 679–80, 759 A.2d 764 (2000); *Jensen v. State,* 355 Md. 692, 709–717, 736 A.2d 307 (1999).

 We conduct this assessment based on our independent review of the record. *See Williams,* 364 Md. at 179, 771 A.2d 1082. In doing so, we shall consider the same factors that are relevant to determining whether a lie detector remark

---

7. These standards might be reconciled by viewing the court's discretion as substantially limited by the circumstances. In other words, when the State's discovery violation causes inadmissible evidence to be placed before the jury, it would be an abuse of discretion to deny a mistrial unless the State can show beyond a reasonable doubt that the evidence could not have influenced the guilty verdict.

unduly prejudiced the defendant. *See Guesfeird,* 300 Md. at 659, 480 A.2d 800. We find these factors equally relevant to the harmless error review of a discovery violation resulting in lie detector testimony. There is an important difference, however, in how we evaluate evidence relevant to these factors. We must assess that evidence and those factors through the lens of the harmless error standard rather the prejudice standard governing a "straight" lie detector case. In other words, rather than requiring the party challenging the trial court's mistrial ruling to establish why we should not accept the trial court's assessment of the prejudicial effect of the lie detector remark, we shall require the State to establish that the lie detector remark could not have influenced the guilty verdict. The increased burden on the State is a consequence of its discovery violation. *See Williams,* 364 Md. at 176, 771 A.2d 1082.

## II.

### Young's Lie Detector Testimony To The Jury Was Not Harmless Beyond A Reasonable Doubt

### A.

### The State's Failure To Disclose Lie Detector Information In Violation Of The Discovery Rules Does Not Require Reversal *Per Se*

Pantazes, citing Md. Rule 4–263(b)(4), *Patrick,* and other cases, argues that when "a discovery violation causes prejudice to the defense, even if the violation is unintentional, reversal is required." He contends that the discovery violation, separate and apart from the effect the jury's exposure to the lie detector testimony may have had on the verdict, is alone sufficient to warrant reversal. He points out that in *Patrick,* the Court of Appeals vacated the defendant's conviction, even though the jury heard no testimony about the lie detector test. *Id.* at 37, 617 A.2d 215. Urging us to adopt a new *"per se"* rule, he asks us to hold "that where, as here, the State withholds a lie detector test, and that discovery violation leads to the jury's exposure to prejudicial lie detector testimony, reversal is required as a matter of law."

 Because settled law establishes that prejudice must be shown in order to warrant reversal for either a discovery violation or an improper reference to a lie detector, we decline to adopt the *per se* rule that Pantazes advocates. *See Williams*, 364 Md. at 178–79, 771 A.2d 1082 (prejudice required to justify reversal for discovery violation); *Patrick*, 329 Md. at 36, 617 A.2d 215 (prejudice required to justify reversal for discovery violation, even when the violation related to lie detector results); *Guesfeird*, 300 Md. at 659, 480 A.2d 800 (reference to lie detector test must be prejudicial in order to justify reversal). Instead, we must examine whether Young's lie detector remark mandated a mistrial.[8] We consider that more difficult question next.

## B.

### The Trial Court Erred In Denying A Mistrial Because Young's Lie Detector Remark May Have Influenced The Guilty Verdict

 Urging that we must find that the trial court erred in denying a mistrial, Pantazes relies heavily on the Court of

---

**8.** As part of this argument, Pantazes also claims a violation of his federal due process rights under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). We find no merit in this contention. The *Brady* Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment[.]" *Id.*, 373 U.S. at 87, 83 S.Ct. at 1196–97. "The holding in *Brady v. Maryland* requires disclosure ... of evidence that is favorable to the accused...." *United States v. Bagley*, 473 U.S. 667, 674, 105 S.Ct. 3375, 3379, 87 L.Ed.2d 481 (1985). In this case, there was no "evidence favorable to the accused," because there was no suggestion that Young failed the voice stress analysis. Instead, the record indicates that the officer who conducted the analysis concluded that Young was not deceptive. Moreover, the failure to disclose this lie detector information was not a *Brady* violation because that information was disclosed during trial. *See, e.g., Jones v. State*, 132 Md.App. 657, 674–75, 753 A.2d 587, *cert. denied*, 360 Md. 487, 759 A.2d 231 (2000)(*Brady* violations and discovery violations are distinct in that *Brady* deals with " 'withholding from the knowledge of the jury, right through the close of the trial, exculpatory evidence ..., not the tactical surprise of opposing counsel' ") (citation omitted).

Appeals' decision in *Guesfeird v. State*, 300 Md. 653, 480 A.2d 800 (1984). In that case, the Court of Appeals held that the defendant in a child sexual abuse case was so prejudiced by the complaining witness's inadvertent reference to taking a lie detector test that the trial court committed reversible error in denying the defendant's motion for a mistrial. *See id.* at 666–67, 480 A.2d 800. The complaining witness, Tina, testified that her mother's live-in boyfriend had sexually abused her. During her testimony, Tina volunteered that she took a lie detector test, and defense counsel moved for a mistrial on the ground that the jury would infer that the witness had passed the test. "The trial judge gave a cautionary instruction to the jury to disregard any evidence of a lie detector test." *Id.* at 657, 480 A.2d 800.

The Court of Appeals reversed Guesfeird's conviction, because Tina's lie detector testimony was "so prejudicial that it denied the defendant a fair trial." *Id.* at 659, 480 A.2d 800. In doing so, the Court set forth factors to consider when evaluating prejudice from the admission of evidence of a lie detector test. *See id.* Applying these factors, the Court explained why Tina's lie detector remark warranted a mistrial.

Tina [who testified she was sexually abused by her mother's live-in boyfriend] was the only witness for the state to testify to the crimes alleged. Undoubtedly, if she was believed, her testimony was sufficient to support a conviction. As the trial developed, however, it became clear that the crucial question was whether Tina was to be believed.

Tina's testimony was contradicted by all the other witnesses who testified. Appellant testified and expressly contradicted Tina, denying any sexual misconduct. Appellant further testified that he was suffering from an automobile accident and was on crutches at the time of Tina's allegations and he therefore had difficulty moving about. Further, Tina's brother .... testified that Tina had made approximately ten other similar accusations against several other men .... [including] another man Tina's mother had lived with for several years.... Tina's brother suggested that the recent accusations were motivated by Tina's desire

to obtain a change in custody because she was unhappy about performing her assigned household chores. *Id.* at 657, 480 A.2d 800.

The Court also examined cases from other jurisdictions in which lie detector testimony justified a mistrial because the blurting witness's credibility was so crucial to the outcome. "In *[Maine] v. Edwards,* 412 A.2d 983 (Me.1980), the court reversed a conviction for gross sexual misconduct. On direct examination, the complaining witness made an inadvertent reference to the fact that she had taken a lie detector test." *Guesfeird,* 300 Md. at 659–60, 480 A.2d 800. The *Guesfeird* Court quoted the Maine court as saying that it was not " 'necessary to require a mistrial to be automatic upon any mention of a polygraph examination by a witness.' " *Id.* at 660, 480 A.2d 800. It attributed the Maine court's reversal to the "credibility of the complaining witness [being] a crucial issue," emphasizing that "[s]he was the principal prosecution witness, whose uncorroborated testimony provided the only basis on which the jury could find the defendant guilty." *Id.*

*Guesfeird* also discussed *Michigan v. Yatooma,* 85 Mich. App. 236, 271 N.W.2d 184 (1978), another case cited by Pantazes, in which one of the two witnesses against the defendant stated that one of the terms of his plea agreement with the state was that he pass a lie detector test. The *Guesfeird* Court pointed out that in *Yatooma,* the Michigan court "reversed the conviction because the crucial issue of the trial was the credibility of the witnesses versus that of the defendant." *Guesfeird,* 300 Md. at 660, 480 A.2d 800.

The Court of Appeals concluded that Tina's uncorroborated testimony was the only thing standing between Guesfeird and acquittal.

[T]he sole prosecution witness on which the alleged crimes were based was Tina. Her uncorroborated testimony con-flicted directly with the testimony of the defendant and all the other witnesses. In this case, credibility was the crucial issue for the jury. Tina, who stated that she had taken a lie detector test, was the principal witness, and the sole prose-

cution witness whose testimony supported the charges. The unavoidable inference for the jury to make is that if she took the test, she passed and was telling the truth at trial; otherwise, the prosecution would not have gone forward with her as the only witness. We believe some, if not all, of the jurors might well have turned to this inadmissible evidence as the deciding factor in determining whom to believe.

*Id.* at 667, 480 A.2d 800.

Pantazes argues that "[t]here can be no principled distinction" between *Guesfeird* and this case. We disagree. The pronounced difference between *Guesfeird* and the present case is that in *Guesfeird,* the prosecuting witness who made the lie detector remark provided the only evidence supporting the sexual assault charge against the defendant. Here, the witness who made the lie detector remark was not the sole source of evidence against Pantazes. Instead, Young's role in the trial was to corroborate Chambers' testimony about Pantazes' murder plans, and to link him to damaging tangible evidence that further corroborated the story the jury already had heard from Chambers. Although we agree with Pantazes that Young played an important role in the State's case, we cannot say that the State's case against Pantazes rose and fell solely on her credibility.

Pantazes also relies on *Kosmas v. State,* 316 Md. 587, 589, 560 A.2d 1137 (1989), in which the Court of Appeals reversed the conviction of the defendant for murdering his wife, because a private detective testified that the defendant had refused to take a lie detector examination. Kosmas and his wife, Maria, developed marital problems about the time that Maria began to work outside the home. Suspicious that she was having an affair with one of her employers, Kosmas hired Edward Mattson, a private detective and retired police sergeant, to conduct surveillance. In February 1985, Mattson found Maria in a motel room with the suspected paramour. On December 20, 1985, Maria's body was found, strangled to death, in her automobile in the parking lot of an apartment complex two-tenths of a mile from the Kosmas home.

At trial, the oldest of the Kosmas children "testified that his father was verbally and physically abusive to his mother, had . . . held a gun to her head, and had threatened to kill her if she left the family." *Id.* at 590, 560 A.2d 1137. He also testified that "his father had confided in him that he entered into a contract with Mattson to have Maria killed." *Id.* Kosmas, a retired school teacher who enjoyed an excellent reputation in his community, testified that he had not threatened, abused, killed, or contracted to kill his wife. *See id.* at 590–91, 560 A.2d 1137.

Mattson testified that he found Maria's body, after Maria's mother retained him to help look for Maria because she had been missing from her home for three days. *See id.* at 591, 560 A.2d 1137. Mattson related that, after finding Maria, he went to Kosmas' home, where he found Kosmas being interviewed by police detectives. Mattson testified that after the police interview was finished, he talked to Kosmas, and asked him, "Would you take a lie detector?" and that Kosmas had said no. *See id.* at 592, 560 A.2d 1137. When the defense requested a mistrial as a result of this testimony, the trial court declined, and sua sponte instructed the jury that it should "ignore any remark about a lie detector test." *See id.* Following his conviction for second degree murder, Kosmas appealed, asserting that he was prejudiced by Mattson's testimony about his refusal to take a lie detector test.

The Court of Appeals applied the *Guesfeird* factors, noting that it suspected Mattson's blurt to be intentional. *See id.* at 596, 560 A.2d 1137. Following *Guesfeird,* it concluded that the more important factor was whether Kosmas' credibility was a crucial issue.

> More important . . . are the questions of whether credibility of the defendant was a crucial issue in the case, and whether the strength of the State's case was otherwise such that the prejudice resulting from the improper admission of the evidence may be considered insubstantial. On the first issue, it is clear that the defendant's credibility was critical to the success of his case. Much of the strength of the State's circumstantial evidence depended upon the jury

believing that the defendant had repeatedly threatened and abused his wife, and had attempted to contract for her murder. The defendant adamantly denied the truth of those allegations. Informing the jury that the defendant had refused to take a lie detector test cut to the heart of the defense.

*Id.* at 596–97, 560 A.2d 1137. The Court concluded that the prejudice from informing the jury that the defendant refused a lie detector test was pervasive.

"In [circumstantial evidence cases] particularly, to tell a jury of laymen at the very outset of the trial that defendant refused a number of times to take a lie detector test was to create a probable aura of prejudice which would permeate the proceeding to the very end."

*Id.* at 597, 560 A.2d 1137 (quoting *New Jersey v. Driver*, 38 N.J. 255, 183 A.2d 655, 658 (1962)). The *Kosmas* Court reversed because it concluded that "the damage in the form of prejudice to the defendant transcended the curative effect of the instruction[.]" *Id.* at 594, 560 A.2d 1137.

The most obvious difference between *Kosmas* and the instant case is that in *Kosmas*, the lie detector reference involved the defendant, not a witness. To say that the defendant refused a lie detector test is close to saying that he was conscious of his guilt, and fearful that his consciousness of guilt would show up on the test results. It is more powerful than saying that a witness took a lie detector test, because it provides a glimpse into the defendant's state of mind. It is unfair to the defendant because the imperfections of the test may, indeed, provide him with reasons to decline to take it, aside from consciousness of guilt.

In *Kosmas*, the Court of Appeals held that the inadmissible lie detector testimony "cut to the heart of the defense" because the defendant testified and "adamantly denied the truth of those allegations." *Id.* at 597, 560 A.2d 1137. We think the same "aura of prejudice" would permeate a case like this one, in which the defendant chose to remain silent. We are not persuaded, however, that the same "aura of prejudice" existed

under these circumstances when Young mentioned that she took a lie detector test. Young's blurt said nothing about Pantazes' state of mind.

A second major difference between *Kosmas* and this case is that in *Kosmas,* the State's case lacked both the direct testimony of an accomplice and the tangible evidence that the State presented in the instant case. Applying the *Guesfeird* factors, the *Kosmas* court characterized the State's case as entirely circumstantial.

> Overall, it is fair to say that if [the son] and Mattson are believed, the State has a strong circumstantial evidence case, but even then it is not overwhelming. If the defendant is believed in those areas in which his testimony conflicts with that of [the son] and Mattson, the State's case is very weak. Again, then, it is apparent that the issue of the defendant's credibility is a central and crucial factor in this case. . . .

*Id.* at 598, 560 A.2d 1137. Here, the State's case was not just circumstantial. The State presented the shooter, Chambers, who testified that Pantazes hired her to murder his wife, and helped her do it.

Although we have distinguished the cases cited by the defense, we find the State's cases to be equally inapposite. The State cites several Maryland cases involving lie detectors. *See Lusby v. State,* 217 Md. 191, 141 A.2d 893 (1958); *Hawkins,* 326 Md. 270, 604 A.2d 489; *Kelly v. State,* 16 Md.App. 533, 298 A.2d 470, *aff'd. on other grounds,* 270 Md. 139, 310 A.2d 538 (1973). We agree with Pantazes that none of these cases is particularly instructive for the present case. *Lusby* was criticized in *Guesfeird* for not analyzing the *Guesfeird* factors, and because it relied on a "no longer persuasive" Ohio case. *Guesfeird,* 300 Md. at 665, 480 A.2d 800. *Kelly,* also decided before *Guesfeird,* includes no analysis of the *Guesfeird* factors. *See Kelly,* 16 Md.App. at 542–44, 298 A.2d 470. In *Hawkins,* two police witnesses referred to a "polygraph suite," but did not suggest that any witness took a polygraph. *Hawkins,* 326 Md. at 278–79, 604 A.2d 489.

We have not been directed to any case involving a discovery violation that resulted in lie detector testimony to the jury by an important State witness. Although *Patrick* addressed the State's failure to disclose the results of a lie detector test on one of its important witnesses, the results of that test were helpful to the defense and were never presented to the jury. *See Patrick,* 329 Md. at 29, 617 A.2d 215.

 In the absence of precedent addressing the "double-barreled prejudice" present in this case, we conclude that we must apply a two-pronged analysis in order to determine whether a mistrial was required. We consider the effect of the lie detector remark (1) in light of the *Guesfeird* factors, in order to (2) determine whether we can say that there is no reasonable possibility that the lie detector remark may have contributed to the rendition of the guilty verdict. *See Dorsey,* 276 Md. at 659, 350 A.2d 665.

Although the *Guesfeird* factors "are not exclusive and do not themselves comprise the test," *Kosmas,* 316 Md. at 594, 560 A.2d 1137, they provide the focal point for our discussion. When we apply these six factors to the instant case, we can say that three of them weigh against a conclusion that the jury was influenced by Young's lie detector remark, and three weigh in favor of the same conclusion. But we do not give these factors equal weight. Instead, as we explain below, we conclude there is a reasonable possibility that the jury may have considered the lie detector remark in assessing the two most important factors in this case—the credibility of the two principal witnesses upon whom the State's case depended, and the value of the "great deal" of tangible evidence that the State offered to corroborate the testimony of those witnesses.

### (1) Whether the reference to a lie detector was repeated or whether it was a single, isolated statement.

The single, isolated nature of Young's remark weighs against the possibility that the jury was influenced by it.

**(2) Whether the reference was solicited by counsel, or was an inadvertent and unresponsive statement.**

Because the lie detector remark was made on cross-examination by an inexperienced witness, and was not solicited by either counsel, this factor also weighs against the possibility of influence.

**(3) Whether the witness making the reference is the principal witness upon whom the entire prosecution depends.**

Although Young was an important witness, she was not the principal witness upon whom the entire prosecution depended. Rather, the principal witness was Chambers, the shooter, and Young was a corroborating witness. This factor weighs against finding the possibility of influence on the jury.

**(4) Whether credibility is a crucial issue.**

As we will discuss in more detail below, many doubts as to Young's credibility were lessened because her testimony was corroborated by other, independent evidence. Thus, the possibility of influence and the need for a mistrial is diminished. That said, the question remains whether that possibility is diminished enough for us to say that no reasonable possibility of influence remains. We examine both that evidence and that question below.

**(5) Whether a great deal of other evidence exists.**

There was significant testimony and evidence corroborating Young's testimony. In addition, Young herself was a corroborating witness, and the crucial testimony linking Pantazes to the murder came from Chambers, who testified that she performed the murder at Pantazes' bidding. As we will explain in more detail below, there was also other evidence corroborating Chambers' testimony. Although that evidence tilts against a finding of influence, the same question remains as to whether it is sufficient to erase all reasonable possibilities of influence.

**(6) Whether an inference as to the result of the test can be drawn.**

An inference may be drawn that Young would not be testifying if she had not passed the lie detector test. *See Guesfeird,* 300 Md. at 661–62, 480 A.2d 800. Thus, this factor weighs in favor of a finding that Young's remark influenced the jury.

Factors four and five merit more discussion than we provided in the listing above. With respect to factor four, there is no doubt that Young was an important corroborating witness. If there were no corroboration of her testimony, our task would be easy. What made Young believable, and our task more difficult, however, is that her testimony was corroborated by other highly reliable evidence.

The State offered telephone records of thirty-one calls from Pantazes' cell phone to Young's number. In addition, Young's phone number was written on a piece of paper under the blotter on Pantazes' desk at his office. Yet, when the police set up a monitored call between Pantazes and Young, Pantazes denied knowing Young. During the same conversation, Young accused Pantazes of murdering his wife, and mentioned the yellow piece of paper Pantazes had given her with Pantazes' address and garage code. Pantazes, still denying he knew Young, nevertheless agreed to meet her, professing interest in information that Young possessed. When Young suggested meeting at Paul's Liquor, Pantazes again feigned ignorance—repeatedly denying that he knew where it was. Yet an employee at Paul's Liquor testified that Pantazes regularly came to Paul's Liquor in his green Suburban. Pantazes' feigning ignorance of both Young and Paul's Liquor is evidence of his consciousness of guilt.

Moreover, Pantazes could not explain away his payment of $1,300 to Young. When Pantazes met Young at Paul's Liquor for the stated purpose of getting information from her, he neither received nor asked for information. Instead, he paid Young $1,300, remarking that he feared he was under surveillance. The police verified this payment by searching Young

before and after her meeting with Pantazes. Pantazes' asserted defense that he was paying Young for information fares poorly when one considers that Pantazes offered no explanation for why he paid Young for information that he did not share with the police.

What Young said she had, and told Pantazes she had, was evidence that incriminated Pantazes—a yellow piece of paper with Pantazes' address and garage code written on it. This yellow paper was critical to the State's case because it went beyond corroborating that Pantazes had a relationship with Young. It corroborated Young's story that Pantazes had solicited her to murder his wife in the family's garage. Pantazes argued that Young could have fabricated the yellow paper, or gotten it from Pantazes' "very messy" truck. Pantazes also challenged its authenticity by pointing out that the police did not find it when they searched Young's apartment, and that Young only produced it later. The belated production of this paper supports Pantazes' claim that it was fabricated.

If we were just looking at a lie detector remark without the discovery violation, we might be inclined to weigh *Guesfeird* factor four against a finding of prejudice. But looking through the lens of a harmless error standard, we are not persuaded that there was no reasonable possibility that the lie detector blurt helped the jury to believe Young. The most important evidence corroborating Young's testimony—the yellow piece of paper—was tied to the jury's assessment of Young's credibility. If the jury was influenced by Young's lie detector blurt, then it would be more likely to believe Young's explanation for her belated production of the yellow piece of paper.

*Guesfeird* factor five directs that we consider what other evidence existed besides that presented by the witness who made the lie detector blurt. Young was only a corroborating witness. The State's key witness was Chambers, who gave detailed testimony about how Pantazes utilized her prostitution services, and then directed and paid her to carry out the

murder. Like his relationship with Young, Pantazes' relationship with Chambers was corroborated. A college student had twice seen two people, fitting the descriptions of Pantazes and Chambers, enter a vacant townhouse on K Street in March. Chambers had described a townhouse on K Street as the place where she and Pantazes went to engage in sex during the same time period.

Chambers' cousin also testified that she answered telephone calls from a man called "Steve," whom she identified as a "white guy" with a high pitched voice. She reported that he made fourteen calls to her residence, asking for Chambers. When the cousin produced "Steve's" number, which she had written on a sheet of paper, it turned out to be Pantazes' cell phone number. Another relative confirmed that the same person called twice on her birthday. The defense explanation for these calls, that he was looking for a "jumper" as part of his bail bond business was weakened by his partner's testimony that, in fact, it was Mrs. Pantazes who did the "office work" trying to track the only jumper they were searching for during the months Pantazes was calling Young and Chambers. Nonetheless, Pantazes' calls and visits to Young and Chambers proved only that he knew them, and perhaps had a relationship, not that he directed the murder.

On the other hand, tangible evidence corroborated Chambers' testimony and linked Pantazes to the crime. Chambers testified that after she shot Mrs. Pantazes and drove away in her car, she placed a call to Pantazes on Mrs. Pantazes' cell phone to tell him that the deed had been done. The State produced cell phone records to show that the call was made to Pantazes. This was crucial evidence for the State. Defense efforts to portray this call as a last-minute call for help from Mrs. Pantazes were challenged by the State's production of additional cell phone records and testimony from a cellular phone company representative indicating that the cell tower utilized was in Landover, closer to Washington, D.C., rather than a cell tower closer to the Pantazes' home in Upper Marlboro.

Yet the cellular phone company representative admitted she was not certain that a call could not be transferred to a different tower if the closest tower was over-utilized at the moment of the call. Further, the neighbor across the street testified that he told the police on the afternoon of the murder that he saw Mrs. Pantazes' Jeep driving away closer to 10:30 a.m. than 9:30 a.m., although the cell phone records recorded the call at 9:40 a.m. This evidence as to time reinforced Pantazes' theory that the call was made by Mrs. Pantazes to Pantazes from the garage, rather than by Chambers, as she was driving towards Washington. Given the factual dispute regarding the place of the phone call, the jurors had to decide whether they believed Chambers when she said that she had placed the call to Pantazes herself.

When credibility is central to the resolution of the case, the error is far less likely to be harmless. *See Martin v. State,* 364 Md. 692, 703, 775 A.2d 385 (2001); *Kosmas,* 316 Md. at 596, 560 A.2d 1137; *see also Rubin v. State,* 325 Md. 552, 592, 602 A.2d 677 (1992) (Bell, J., dissenting) ("if credibility is central to the resolution of the case, the error in admitting that evidence is . . . not harmless"). It is the jury, not an appellate court that must find the facts and resolve credibility issues. *See Kosmas,* 316 Md. at 596, 560 A.2d 1137. For the reasons explained in discussing factors four and five above, we cannot say that Young's credibility was not important to the jury's resolution of the case.

We have reviewed two critical corroborating facts—the yellow piece of paper and the cell phone call after the murder. The jury had to resolve competing inferences regarding this tangible evidence. In deciding whether to accept the authenticity of the yellow paper, the jury had to decide whether to believe Young. In deciding whether Mrs. Pantazes or Chambers made the cell phone call, the jurors had to decide whether to believe Chambers. In deciding whether to believe Chambers, it was encouraged by the State to consider Young's corroborating testimony. In these circumstances, we cannot say beyond a reasonable doubt that Young's credibility could

not have influenced the jury verdict. Nor can we say beyond a reasonable doubt that· no juror was influenced by the lie detector remark in assessing Young's credibility.

Our task is not to decide whether the jury was more likely than not to have considered the test. If we can say that there is a reasonable possibility that the jury did consider the lie detector test, then we are required to reverse. *See Williams,* 364 Md. at 179, 181, 771 A.2d 1082; *Rainville v. State,* 328 Md. 398, 411, 614 A.2d 949 (1992); *Dorsey,* 276 Md. at 659, 350 A.2d 665. We conclude that we must do so in this case.

**JUDGMENT VACATED. CASE REMANDED FOR NEW TRIAL. COSTS TO BE PAID BY CHARLES COUNTY.**